John G. MILLER, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 86–130.

Supreme Court of Wyoming.

Feb. 13, 1987.

David B. Hooper, Riverton, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Robert J. Walters, Asst. Atty. Gen., for State of Wyoming.

Before BROWN, C.J., and THOMAS,[*] CARDINE, URBIGKIT, and MACY, JJ.

URBIGKIT, Justice.

Defendant, John G. Miller, a practicing attorney in Colorado, engaged in home building there, then moved to Casper, Wyoming, where his newly formed Wyoming corporation eventually encountered difficulty due to the economic disaster in that area. After closing two sales based on title insurance company affidavits that all costs were paid, Miller was prosecuted on two counts for obtaining property under false pretenses, when subcontractor claimants filed lien claims on the sold property. The charges were tried before the court, and Miller now appeals his two felony convictions.

Appellant argues three issues on appeal: (1) individual criminal responsibilities did not exist for acts committed on behalf of the corporate entity; (2) insufficiency of the evidence to prove intent to defraud or obtain property by false pretenses; and (3) the imposed restitution sentence is contrary to law.

### FACTS

Miller was admitted to practice law in Colorado in 1965, and went inactive in that profession while engaged in general home building first in Colorado, and then from 1978 to 1983 in Casper, where through a majority-owned Wyoming corporation, Hilltop Homes, Inc. (Hilltop), he built about 100 residences. His actual investment in the company totaled about $1,000,000. For the business operation in Casper, title insurance for sales was secured from Rocky Mountain Title Insurance Agency (then owned by Milton Coffman) as a local agent for a national title insurance company. Financing trouble developed due to the economic downturn in 1981–1982, and both Miller and Hilltop went into Chapter 11 bankruptcy in late 1982.

Prior thereto, on September 14, 1982, Hilltop closed a sale to Richard Beal. At closing, Rocky Mountain Title, as the closing agent, used one of their pre-printed forms "Final Affidavit and Agreement" (corporate). The documents, signed by Miller as President of Hilltop, stated in material part:

"1. That he is the *President* of *HILLTOP HOMES, INC.* a corporation herein designated 'General Contractor', and that he is duly authorized by said corporation to make this affidavit, for any and all purposes herein contemplated or intended.

"2. That the undersigned and the General Contractor, for the purposes of inducing the Rocky Mountain Title and Abstract Company to issue an ALTA mortgage policy in connection with the hereinafter described property, do hereby make the following representations, covenants and agreements to the Rocky Mountain Title and Abstract Company, with full knowledge that said company shall reply thereon.

"3. That all persons, firms and corporations including the general contractor and all subcontractors who have furnished services, labor or materials, according to the plans and specifications or otherwise, used in the construction of improvements on the real estate herein-

after described, have been paid in full, and that such work has been fully completed and accepted by the owner, and that *no liens* of any nature whatsoever have now, or *will in the future attach* to said real estate. [Emphasis added.]

"4. That all persons, firms and corporations including the general contractor and all subcontractors who have furnished services, laborer or materialman, and that no chattel mortgages or conditional sales contract have been made or are now outstanding as to any materials, appliances, fixtures, or furnishings, placed upon or installed in said premises.

"5. The undersigned and the general contractor covenants, agree and guarantee to hold each and every party making a loan on said real estate as improved and his or its successors and assigns, and also to hold the Rocky Mountain Title and Abstract Company either by reason of the fact that it has issued a policy of title insurance or acted as escrowee, harmless against any lien claim or suit by or against the general contractor, subcontractor, mechanic, laborer or materialman, and against any chattel mortgage or conditional sales contract in connection with the construction of the improvements on said real estate by the undersigned.

"LOT 3, BLOCK 8, WOLF CREEK ONE, AN ADDITION TO THE CITY OF CASPER, NATRONA COUNTY, WYOMING.

　"HILLTOP HOMES, INC., A WYOMING CORPORATION

　"By /s/ John G. Miller

"Attest:

"Secretary James A. Johnson

[Acknowledged by 'John G. Miller, President Hilltop Homes, Inc.']"

Sales financing was funded by First Wyoming Bank, as the permanent homeowner's mortgage loan. Again, on October 28, 1982, another sale was closed, using the same form for sale to David William Har-

ris, and financed by the permanent loan through Guaranty Federal Savings Bank.

Thereafter, a lien was filed on disassociated property, since the subcontractors were more anxious to be paid than cash flow permitted, and the contractor's construction lender, First Interstate Bank of Casper, N.A., discontinued draws of construction payments, and started foreclosure on project properties. Liens were also filed on the Harris and Beal properties, and Miller took himself and his company into Chapter 11 bankruptcy to "buy time" to try to work out the financial problems.

Rocky Mountain had written the lender's title insurance on both properties, and the owner's title insurance, apparently, on only one. Curiously enough, by trial date, although Rocky Mountain had generally provided lien insurance on all policies written for Miller, including all houses which he had built, it had not made any payment to any lien claimants on any title policy. As to these particular houses, there is no evidence that the lien claims ever matured past filing, which was significant since suit is statutorily limited to 180 days from the filing date. Section 29–2–109, W.S.1977. Because criminal prosecution was not instituted until 1985, it was then clear that neither the home owners nor the lenders were exposed to security jeopardy from the lien notices that had been filed in 1982 and 1983.[1]

Without maturity of the lien claims by suit and judgment, there was no determination of original validity or invalidity. The bankruptcy stay order as to the contractor did not toll or deter foreclosure proceedings against the purchaser and lender, *Hamel v. American Continental Corporation*, Wyo., 713 P.2d 1152 (1986), but no foreclosure actions were pursued.

In the brief trial, only one lien claimant testified. The plumbing contractor stated that he had done work on the houses; billed for the work; issued a final bill; and

---

**1.** Apparently Rocky Mountain Title and Hilltop had a separate lending transaction which resulted in a lawsuit being filed by Rocky Mountain Title against Hilltop at some date subsequent to these loan closings.

that it had not been paid although probably interim payments had been made. He could not recall the amount that he was owed on the two houses. He believed that he had worked on all houses constructed by Miller in the area, and had been paid for other jobs that he had done—"the majority of them."

"Q. And you can't tell us today, as I understand it, whether or not you had sent the Hilltop Homes a final bill for your services prior to the time that these two sales in question closed?

"A. I couldn't say today, no."

For whatever reason, he did not file a claim in the bankruptcy proceeding, nor did he file a lien foreclosure action. The record reflects that substantial costs incurred by Hilltop in constructing the two houses remained unpaid at the date of sales closing, in accord with the ongoing process of Hilltop in their volume home-building activities.[2]

The criminal charges, filed February 21, 1985, were:

" * * * [O]n or about the 14th day of September, 1982, in the County of Natrona, State of Wyoming, the said JOHN G. MILLER * * * did unlawfully

*"COUNT I*

"and knowingly obtain property, to wit: $92,950.00 cash from other persons, namely: First Wyoming Bank of Casper, Richard Beal and Donna Beal, by false pretenses with the intent to defraud said persons and the property is valued at or above twenty-five dollars ($25.00) in violation of W.S. 1977, § 6–3–106

*"COUNT II*

"On or about the 28th day of October, 1982, in the County of Natrona, State of Wyoming, the said JOHN G. MILLER did unlawfully and knowingly obtain property, to wit: $100,000.00 cash from

other persons, namely: Guaranty Federal Savings and Loan, David W. Harris, by false pretenses with the intent to defraud said persons and the property is valued at or above twenty-five dollars ($25.00) in violation of W.S. 1977, § 6–3–106

"contrary to the form of the statute in such case made and provided and against the peace and dignity of the State of Wyoming."

The statute, § 6–3–106, W.S.1977, was repealed by Ch. 75, S.L. of Wyoming 1982 as a rewritten criminal code effective July 1, 1983. The repealing code included a savings clause:

"(b) Except as provided in this section, this act does not apply to offenses committed prior to its effective date and prosecutions for the offenses shall be governed by the prior law, which is continued in effect for that purpose, as if this act were not in force. An offense was committed prior to the effective date of this act if any of the elements of the offense occurred prior to the effective date.

"(c) In a case pending on or after the effective date of this act, involving an offense committed prior to the effective date:

* * * * * *

"(iii) If the penalty for the offense under this act is different than the penalty under prior law, the court shall impose the lesser sentence." Section 6–1–101, W.S. 1977, 1982 Replacement.

The law in effect in late 1982, § 6–3–106 provided:

"If any person or persons shall knowingly and designedly, by false pretense or pretenses, obtain from any other person or persons any choses in action, money, goods, wares, chattels, effects, or other valuable thing whatever, with intent to cheat or defraud any such person or persons of the same, every person so offend-

**2.** Justification for false-pretenses conviction could hardly be derived from subcontractors with unpaid charges against contractors. If so, at least one new Wyoming penitentiary would be immediately required. Going to jail for going broke is not the modus vivendi of American society under current constitutional constraints.

ing shall be deemed a cheat, and upon conviction, where the value of such chose in action, money, goods, wares, chattels, effects or other valuable thing shall be twenty-five dollars ($25.00) or more, shall be imprisoned in the penitentiary for a period not more than ten (10) years. In all cases where the value of such chose in action, money, goods, wares, chattels, effects or other valuable thing is less than twenty-five dollars ($25.00), the person so offending shall be punished by a fine not to exceed one hundred dollars ($100.00), or by imprisonment in the county jail not more than six (6) months. In either case under this section he shall be sentenced to restore the property so fraudulently obtained if it can be done."

The present felony statute on obtaining property by false pretenses, § 6–3–407, W.S.1977, 1986 Cum.Supp., states:

"(a) A person who knowingly obtains property from another person by false pretenses with intent to defraud the person is guilty of:

"(i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is five hundred dollars ($500.00) or more;

"(ii) Repealed by Laws 1984, ch. 44, § 3;

"(iii) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the value of the property is less than two hundred dollars ($200.00)."

An interesting quandary is raised in regard to the category of the offense chargeable in 1985, pursuant to the savings clause. Initially, Ch. 75, S.L. of Wyoming 1982, differentiated felony from misdemeanor by a $200.00 value. In 1983, the value was raised to $2,000.00, and in 1984, reduced to $500.00. Apparently the state believed that the $25.00 amount in the pre–1982 laws still applied, even though the later law would indicate to the contrary. However, the issue of value was not presented as an issue on appeal, and the evidence reflected a total amount of unpaid bills likely to be in excess of $2,000.00. See, however, *Attletweedt v. State*, Wyo., 684 P.2d 812 (1984).

In 1982, the legislature added a totally new provision to the criminal code which never went into effect but was replaced by the present statute, § 6–3–608, W.S.1977, 1983 Replacement, effective July 1, 1983 (Ch. 171, S.L. of Wyoming 1983):

"Fraudulent use of materials * * *.

"(a) A contractor or subcontractor who purchases materials on credit and represents that they will be used in a designated building or improvement and who knowingly and with intent to defraud the seller uses the materials or allows them to be used in a building or improvement other than the one designated is guilty of a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both.

"(b) Any contractor who receives money from an owner and provides the owner with an affidavit that all materialmen and subcontractors have been paid when he knows all materialmen and subcontractors have not been paid is guilty of a felony and shall be sentenced to not more than five (5) years in the penitentiary, fined not more than ten thousand dollars ($10,000.00), or both. Lien waivers signed by all materialmen, subcontractors and laborers are prima facie evidence that monies received from the owner were applied toward construction costs by the contractor."

Criminal jeopardy is now provided by the present law for casual use of bills-paid affidavit forms comparable to Miller's pre-passage conduct. This case will provide no comfort against future prosecutions under the 1983 lien affidavit statute.

However, as tried to the court under the conventional false-pretense statute, Miller was convicted and sentenced to a term of 120 days in the county jail, two years probation, and

"3. That the defendant shall make restitution as determined by the Department

of Probation and Parole to the victims in the said case, subject to review by this Court."

The legal status of his house-building business is clouded by the bankruptcy which resulted in an order confirming a plan under Chapter 11 entered March 13, 1985. Clearly, no losses from unpaid subcontractors and supplier bills resulted to the two home purchasers, and/or the two lenders, as buyer and lender, or to Rocky Mountain Title, for whom the "indemnity" document was signed. If loss was sustained, it occurred only to the materialmen and suppliers, whose claims, if filed, were modified by the payment terms of the confirmed bankruptcy plan. All funds received from the two sales were applied to ongoing obligations of the business operation, and no portion from the transaction was directly received by Miller.

Rocky Mountain Title did not claim fraud against Miller in its relationship with the transaction, which leaves this court to determine whether what Miller did is sufficient to confirm the criminal conviction under the criminal complaints as prosecuted.

## ISSUE NO. 1

*Corporate entity insulation from individual criminal liability*

■ Miller first argues that he should not be criminally liable for a document signed for the benefit of the corporate entity. He says:

"This issue deals with the defendant's individual responsibility for acts performed by the corporation."

Although there is some authority to the contrary, we find the better and majority rule to be that the existence of a corporate entity does not insulate an officer and major shareholder from criminal charge for acts committed for the benefit of the corporation. The subject has not been addressed previously in Wyoming cases except by oblique reference in *Nickelson v. People*, Wyo., 607 P.2d 904 (1980), which is not dispositive.

The general rule is well phrased and supported by authority, as stated in the State's brief:

"It is the general rule * * * that an officer or agent of a corporation cannot shield himself from criminal responsibility for his own act on the ground that it was done in his official capacity as an officer of a corporation; nor can he assert that acts in corporate form are not his acts merely because they are carried out by him through the instrumentality of a corporation which he controls and dominates and which he employs for that purpose. *Parish v. State*, 178 Ga.App. 177, 342 S.E.2d 360, 361 (1986); *Bourgeois v. Com.*, 217 Va. 269, 227 S.E.2d 714, 718 (1976); *People v. Cheff*, 37 Mich. App. 1, 194 N.W.2d 401, 406–408 (1971) * * *. * * * [T]he existence of a corporate entity does not shield from prosecution corporate agents who knowingly and intentionally cause the corporation to commit crimes, in that a corporation obviously acts, and can act, only by and through its member agents and it is their conduct which criminal law must deter and those agents who in fact are culpable. *State v. Placzek*, Me., 380 A.2d 1010, 1015 (1977). Further, it is not a defense in a criminal prosecution against a corporate officer for acts done on behalf of the corporation that the benefits went to the corporation and not to the defendant. *People v. Cheff*, supra, 194 N.W.2d at 408."

Appellant, an 85 percent owner and general managing officer of Hilltop, falls within the constraints of the liability rule, and is afforded no corporate entity defense for his acts. *Parish v. State*, 178 Ga.App. 177, 342 S.E.2d 360 (1986); *Moore v. State*, 104 Ga.App. 93, 121 S.E.2d 75 (1961); *Butts v. Commonwealth*, Ky., 581 S.W.2d 565 (1979); *State v. Placzek*, Me., 380 A.2d 1010 (1977); *Bourgeois v. Commonwealth*, 217 Va. 268, 227 S.E.2d 714 (1976). Contra, *Conger v. State*, Fla.App., 130 So.2d 292 (1961); *Fiske v. Florida*, Fla.App., 106 So.2d 586 (1958).

## ISSUE NO. 2

*Sufficiency of the evidence*

The Rocky Mountain Title form had consistently been used for the policy issuance during the course of Miller's building enterprise in Casper. The conceptual difficulty in addressing the requisite "intent" is that only Rocky Mountain Title or the licensing title insurance company for whom it was the local agent, would be at risk since the insurance they wrote would accommodate claims against the property to protect the title interests of lender and buyer.[3] Although Rocky Mountain was not a complainant and did not suffer a loss, if intent to defraud is apparent, it would be intent to defraud the insurer and not the insureds. Within the relationship between the home builder and the title insurance writer is a factor of scienter, that if the bills were not paid, the insurance carrier would be protected by the written indemnity provided by the same document. Stripped of academics, the case afforded the inquiry of a false-pretense offense created in providing lien-protection insurance.

The closing agent for Rocky Mountain Title, Mrs. Veronda, testified:

"Q. [By the State:] Prior to him signing it did you give him any explanation what that document was?

"A. Yes, I did.

"Q. What did you tell him?

"A. Without being able to repeat it verbatim, a standard little speech I give at closing essentially says this document is the final affidavit that you have either paid everyone, paid any bills that were outstanding, or made provision to pay same."

Defendant Miller testified:

"Q. And did you hear Mrs. Veronda testify with respect to her statements to you regarding the affidavit in question?

"A. Yes.

"Q. All right. And insofar as you can recall was her testimony accurate?

"A. Yes, she indicated to me, she asked if all the bills, she indicated to me the affidavit stated all the bills were paid or we would make provision for the payment, just as she testified, yes.

"Q. And what was your reaction to that?

"A. Agreed that everything wasn't paid for, we had a provision made to pay for because would come off of the cash flow."

All sales proceeds went into the company accounts and were used in the ongoing business operation until a Veterans Administration closing was delayed, a lien was filed, and

"A. * * * [T]here wasn't much else that we could do at that point other than to go into a Chapter 11, we had substantial equity still, Miss Bishop testified that I thought there would be sufficient equities to pay all of the obligations, what I did, we went into Chapter 11 to stop foreclosure procedures and to give us an opportunity to sell the property because had indicated as far as the Devonshire equity position in that was well over 200,-00 [sic], had over a hundred thousand equity in the Mountain Village, I figure we had about 60,000 equity in Stoneywood, so long as the market situation even at that point, even selling the lots at lower prices, we would have plenty of money to pay off the obligations of the company, and that is why we went in, didn't consider taking Chapter 7, we went into Chapter 11 so that we could get the debts paid.

 * * * * * *

"Q. And at any time when you received or the corporation, Hilltop Homes, received the proceeds from the Harris and Beal sales, was there ever an intention on your part to defraud anyone of anything?

"A. No, all along for a year prior to this time or a year and a half had been paying these bills, and I had provisions made all along to pay them, as we went along.

---

**3.** The unexplained failure to write owner's title insurance in one case did not adversely affect the home buyers since the title insurance covered the risk to the lender.

I thought there was no question we had sufficient cash flow to pay these bills, if anything like this came up where a decline interrupted cash flow, there was sufficient equity in the corporation, we would be able to pay these obligations.

"Q. All right, and even after the bankruptcies were filed, did you undertake any further efforts to pay bills and inject further capital into the corporation?

"A. Yes. In June of 1983 in order to clear Devonshire we had to come up with $15,000 and my mother was able to come up with that money and loan it to Hilltop Homes, so even in June 1983, we put another $15,000 into the corporation, feeling it could still hold together."

On cross-examination by the State, Miller further related:

"Q. Did you at any time at the closing on the Beal property on September 14th, advise any party to the closing that approximately $28,000 in services and materials had not been paid for?

"A. I did not know the amount, there were a lot of bills not even in yet, but I did, as Miss Bishop testified, I did say at closing that there were some bills that were not paid, yes.

\* \* \* \* \* \*

"Q. You indicated that you have never indemnified the title insurance company, Rocky Mountain Title, for their expenses.

"A. I said I have never had to, to my knowledge, I have never had a title company come to me on the affidavit and request any kind of indemnification. I don't think I have ever done that.

"Q. Are you aware that perhaps fees have been paid because of your actions in signing the affidavit?

"A. I don't know, Milt Coffman testified on the stand he had the title company and he suffered no loss, he has made no request to me for any funds on the affidavit, so I assume he has not suffered a loss."

Additionally:

"A. Okay. Do you have any knowledge as to why the title company would have in their agreement such a provision, that you agree to indemnify them in the event there are outstanding bills?

"A. It is basically an indemnification agreement signed by the corporation, which states [if] any bills aren't paid we are going to pay them or indemnify the title company or whoever has to pay them."

From this trial evidence devolved the inquiry into the sufficiency of the evidence to sustain the required proof of intent to defraud the bank and buyers at the sale closing by executing the title insurance company affidavit-indemnity form.

It was precisely for the reason that the historical intent to defraud or false pretense criminal statutes did not suitably apply to lien claim problems in construction that statutes such as § 6–3–608 were enacted. *Blanton v. Commonwealth*, Ky.App., 562 S.W.2d 90 (1978) involved a similar approach to the construction lien situation, and is not authority on the general applicability of the general false-pretenses intent-to-defraud statute.[4]

---

**4.** There are a considerable number of cases not relating to the historical false-pretense offense which involve only specialty statutes specifically addressing use of lien-free affidavits similar to the new Wyoming statute, or other statutes of a similar nature addressing issues of nonpayment of construction costs as a criminal offense. These cases, because of their relation to the particular specialized statutes, are not authority on the intent question under the conventional false-pretense charge in this case. Since this decision will not be authority for the application of § 6–3–608, supra, there is no need to address those noninvolved statutes and applicable cases or the associated questions of constitutionality under Art. 2, § 5, Wyoming Constitu-

tion, except by passing reference that the new Wyoming statute is of a form-use provision and not of the trust theory or bills-paid character. See *Peairs v. State*, 227 Ark. 230, 297 S.W.2d 775 (1957); *People v. Holder*, 53 Cal.App. 45, 199 P. 832 (1921); *Jackson v. State*, 137 Ga.App. 192, 223 S.E.2d 239 (1976); *Meyer v. Berlandi*, 39 Minn. 438, 40 N.W. 513 (1888); *State ex rel. Norton v. Janing*, 182 Neb. 539, 156 N.W.2d 9 (1968); *State v. Hertzog*, 92 S.C. 14, 75 S.E. 374 (1912); *Ex Parte Hollman*, 79 S.C. 9, 60 S.E. 19 (1908); *Commercial National Bank of Sturgis v. Smith*, 60 S.D. 376, 244 N.W. 521 (1932); *Peterson v. State*, Tex.Cr.App. 645 S.W.2d 807 (1983); *Phillips v. State*, Tex.Cr.App., 640 S.W.2d 293

*Conviction of intent to defraud when no resulting injury occurs*

 A change of position by the victim is required, but actual resulting harm is not a necessary ingredient of the crime. Consequently, in itself, the fact that neither the lenders nor the buyers sustained lien cost damage will not necessarily serve as a defense. *Anderson v. State*, 27 Wyo. 345, 196 P. 1047 (1921); *Parish v. State*, supra; *Commonwealth v. Ferguson*, 135 Ky. 32, 121 S.W. 967 (1909). Also, restitution is not necessarily a defense since the offense of obtaining property by false pretenses, if accomplished, is completed upon transfer, conveyance, or payment. *Wilson v. Home Depot, Inc.*, 180 Ga.App. 218, 348 S.E.2d 588 (1986).

*Elements of the false-pretense crime*

The elements of the false-pretense criminal offense which are to be applied to this case are differently stated in Wyoming law and other cases, but generically can be related to the actual occurrence as:

What occurred:

1. Intent—intent to defraud;

2. Committed—actual fraud committed;

3. Transfer—transfer of property by victim;

Based upon:

4. Fraud—false pretenses used;

5. Knowledge of accused—accused has knowledge of the falsity of the pretenses;

6. Reliance—reliance upon the pretenses by the victim.

As stated in LaFave and Scott, Criminal Law, Ch. 8, § 90 at 655 (1982), false pretenses are in five elements, with a subcategory division:

"False pretenses, a statutory crime, although defined in slightly different ways in the various jurisdictions, consists in most jurisdictions of these five elements:

(1) a false representation of a material present or past fact (2) which causes the victim (3) to pass title to (4) his property to the wrongdoer, (5) who (a) knows his representation to be false and (b) intends thereby to defraud the victim."

See also *Driver v. State*, Wyo., 589 P.2d 391 (1979), where we have enumerated (1) the pretenses; (2) their falsity; (3) the fact of obtaining the property by reason of the pretenses; (4) the knowledge on the part of the accused of their falsity; and (5) the intent to defraud.[5] Reliance as a requirement is not separately stated. See *Fitzgerald v. State*, Wyo., 599 P.2d 572 (1979). See also *Haines v. Territory*, 3 Wyo. 167, 13 P. 8 (1887), enumerating: intent to defraud; actual fraud must be committed; false pretenses must be used for the perpetration; false pretenses are the cause which induced the owner to part with his property; with the defrauder knowing that the pretenses were false; and reliance thereon by the person defaulted.

Required elements of the false-pretense offense denominate the sufficiency-of-the-evidence defense. Even though this is a trial to the court, we have held that the same factual rules for appeal consideration apply. *Fitzgerald v. State, supra.*

We have only recently restated and synthesized the principles involved for appellate review in *DeSersa v. State*, Wyo., 729 P.2d 662 (1986):

" 'In reviewing the sufficiency of evidence in a criminal case, this court makes a painstaking review of the record to determine if the evidence is sufficient to permit the jury to reach the conclusion that it did. [Citation.] The court will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that a

---

(1982); *State v. Williams*, 133 Wash. 121, 233 P. 285 (1925). See also *Bailey v. Alabama*, 219 U.S. 219, 31 S.Ct. 145, 55 L.Ed. 191 (1911).

**5.** Although the phraseology of the present false-pretense statute is simpler and more direct, it is indicated by the history of the legislation and the similarities to the prior law that except for modernization of style and text the present statute is intended to continue the identical criminal offense.

defendant was proved guilty of the offense charged. [Citation.] The court considers the evidence in the light most favorable to the verdict and will assume that the jury disbelieved any testimony in conflict with the result it reached. [Citation.]' *State v. Richardson,* Minn., 393 N.W.2d 657, 661–662 (1986)." 729 P.2d at 664.

*Reese v. Dow Chemical Company,* Wyo., 728 P.2d 1118 (1986); *Broom v. State,* Wyo., 695 P.2d 640 (1985); *Nisonger v. State,* Wyo., 581 P.2d 1094 (1978); *Cloman v. State,* Wyo., 574 P.2d 410 (1978).

In applying the criteria of the offense to the facts of this case, intent and reliance will be last considered as the essential appeal issues.

A. *Fraud committed:* Miller executed a false statement that all bills were paid.

B. *Transfer of property:* The sale was closed, and Miller's company received the borrowed money given by the lender to the buyer for payment. Transfer of sale proceeds occurred.

C. *False pretenses used:* All bills were not paid.

D. *Knowledge by the accused of the falsity:* Miller unquestionably knew the status of construction cost payments for the houses.

E. *Reliance—Fact of obtaining by reason of the pretense:* Contrary to nonrequirement of harm, the factor of reliance is indispensable for conviction.

"For false pretenses it is necessary that the swindler's misrepresentation *cause* the victim to pass title to his property or money to the swindler. Looking at the matter from the point of view of the victim, the same thought may be expressed thus: for false pretenses it is required that the victim pass title to his property *in reliance upon* the swindler's misrepresentation." LaFave and Scott, Criminal Law, supra at 659–660.

"To establish the crime of obtaining money or property by false pretenses, it must be shown that a misrepresentation by the defendant was relied upon by the party defrauded, and that such person was deceived. If the person defrauded knew that the representation was false, the offense has not been committed." 32 Am.Jur.2d, False Pretenses, § 51 at 269. "To create an offense, it is not sufficient that there is a false pretense; the owner of the property must rely on it, and it must be an effective or moving cause in inducing him to part with his property, and there must be a causal relation between the representation made and the delivery of the property. Therefore, the offense is not committed if the owner has knowledge of the truth or does not believe the pretense, or does not part with his money in reliance thereon, or, although believing it, yet parts with the property on some other inducement * ." 35 C.J.S. False Pretenses § 22 at 839–840.

*Anderson v. State, supra; Martins v. State,* 17 Wyo. 319, 98 P. 709 (1908); *Haines v. Territory, supra.*

Since we find the dispositive issue of the case to be "intent to defraud," it is unnecessary to analyze whether the requisite reliance existed in the facts of this case for the complainant to bring this criminal proceeding. *Bryant v. Hornbuckle,* Wyo., 728 P.2d 1132 (1986); *Fitzgerald v. State, supra.*

■ F. *Intent to defraud:* The final and dispositive criminal-conviction requirement is intent to defraud. This factor, uniformly required in the Wyoming cases, is discussed in a myriad of cases in other jurisdictions. *United States v. McGee,* 108 F.Supp. 909 (D.Wyo.1952); *United States v. Clawson,* 13 F.Supp. 178 (D.Wyo.1935); *Fiske v. Florida, supra,* 106 So.2d 586; *People v. Rolston,* 113 Ill.App.2d 727, 70 Ill.Dec. 87, 448 N.E.2d 965 (1982); *People v. Jensen,* 103 Ill.App.3d 451, 59 Ill.Dec. 219, 431 N.E.2d 720 (1982); *Ward v. Commonwealth,* 228 Ky. 468, 15 S.W.2d 276 (1929); *Butts v. Commonwealth, supra,* 581 S.W.2d 565; *Commonwealth v. Louis Construction Co.,* 343 Mass. 600, 180 N.E.2d 83 (1962); *Commonwealth v. True,* 16 Mass.App. 709, 455 N.E.2d 453 (1983);

*State v. Neal,* Mo.App., 680 S.W.2d 310 (1984); *State v. Basham,* Mo.App., 571 S.W.2d 130 (1978); *State v. Basham,* Mo. App., 568 S.W.2d 518 (1978); *Wilson v. State,* Tex.Cr.App., 663 S.W.2d 834 (1984); Wharton's Criminal Law § 431 at 472.

Application of intent, uniformly required in the cases, including those cited above which are similar in circumstance, requires us to relate this criminal-conviction criteria to Miller's course of business. No evidence exists that Miller earlier had failed to pay lienable bills, or then planned without reasoned expectancy to do differently for the Beal and Harris homes. He did not do differently than had been the course of the continued business operation. Likewise, Rocky Mountain Title continued its profit expectancy for premium fee as consideration for the lien payment risk similarly involved in issued policies for the prior sales.

Effectuated intent to defraud lender or buyer could only have been accommodated through closing without title insurance since the insurance provided the assurance against liens which would foreclose harm.

In *Peterson v. State,* Tex.Cr.App., 645 S.W.2d 807 (1983), unpaid bills for construction were found. There was no proof of intent not to pay, and the conviction was reversed. Likewise in *State v. Hardin,* Mo.App., 627 S.W.2d 908 (1982), where the purchase involved a truck, and title could not be furnished, the court said that breach of a contractual duty does not amount to embezzlement of larceny by false pretense. *Phillips v. State,* Tex.Cr.App., 640 S.W.2d 293 (1982), involved a contractual agreement for construction, and the court found payment was voluntarily made and that there was no evidence of deception. Intent is similarly considered in *Wilson v. State, supra,* a case involving a course of business in grain purchases.

In the *Basham* cases, supra, the contractor undertook to paint barns, and pursuant thereto, obtained down payments. The two courts held, in reversing both cases, that more evidence than was available is required from which the jury could find an intent to cheat and defraud. In the first case, the evidence only "raises a suspicion of guilt," 568 S.W.2d at 521, and in the second case, the court said that "the State must establish that the defendant had the intent to cheat or defraud at the time the false representations were made to cause the victim to part with his property." 571 S.W.2d at 132.

In *Commonwealth v. True, supra,* 448 N.E.2d 965, a builder was criminally charged when the business fell apart after receiving a $5,000 down payment. The court reversed, and commented that deception cannot be inferred from the nonperformance of a promise. Proof of requisite intent not to perform was insufficient for conviction.

An interestingly similar construction case, *People v. Rolston, supra,* involved an agreement to provide windows. An initial payment was made, but the provider subsequently failed to perform. The court, in addressing the rule that failure to fulfill a contract is not proof of specific intent to defraud, reversed based on the insufficiency of the evidence of requisite intent.

Although Miller's conduct could contendably be criminal under the more recently adopted mechanic's lien/affidavit of bills paid statute, § 6–3–608, W.S.1977, 1983 Replacement, we cannot find the requisite intent to defraud to sustain the conviction under the false-pretense statute, and consequently reverse.

## ISSUE NO. 3

*Restitution*

With this result, discussion of the restitution issue will not be required. We note particularly that we do not decide whether others might have been intended to be beneficiaries of the restitution imposed by the sentence.

Reversed and remanded for entry of a judgment of acquittal.

URBIGKIT, Justice, delivered the opinion of the Court; CARDINE, J., filed a specially concurring opinion in which THOMAS, J., joined.

CARDINE, Justice, specially concurring with whom THOMAS, Justice, joins.

I concur in the result of the above case. I disagree with the proposition that where title insurance exists, the intent to defraud can never be an intent to defraud any party other than the insurance carrier. The statement is too broad and the facts and circumstances of each sale of real estate too varied. I can envision situations in which a builder files a false affidavit concerning the payment for labor and materials, intending to defraud the purchaser, the lending agency, and the insurance company. An experienced builder knows that insurance companies, for many reasons, do not always pay claims. It is probable that the builder does not care whether or not claims are paid.