THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ERIC T. JENSEN, Defendant-Appellant.

Third District    No. 81-447

Opinion filed January 28, 1982.

Robert Agostinelli and Stephen H. Omolecki, both of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Kenneth A. Wilhelm, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

Following a jury trial in the circuit court of Tazewell County, the defendant, Eric T. Jensen, was found guilty of five counts of felony theft by deception and three counts of misdemeanor theft by deception to which the court subsequently sentenced him to five concurrent terms of four years' imprisonment. The conviction was premised on a nine-count indictment which charged that between March 23 and April 20, 1981, the defendant knowingly obtained control of money by use of deception, with the intent to deprive the owners permanently of property in violation of section 16—1(b)(1) of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(b)(1)). The indictment alleged that on nine different occasions the defendant falsely told persons that he needed money from them to pay an outstanding debt to the "mob" and thus avoid injury to himself and his wife and child.

On appeal, defendant contends that the State failed to prove his guilt beyond a reasonable doubt. Thus, an examination and analysis of the evidence adduced at trial is mandated.

With slight variations which we will discuss below, the defendant's contacts with his first two purported victims, the Reverends David Wright and Johnny Arnold, both of Morton, Illinois, were identical to those of his other "victims." The defendant, who identified himself as Eric Jensen, called Wright by telephone on March 21 and discussed spiritual matters with him. They arranged to meet later that day at a Morton restaurant. At the restaurant, the defendant first talked about spiritual and religious matters, but then he related the following story. For the past several years, he had worked in the Chicago area for a crime syndicate in some unsavory capacity before recently retiring. (Although witnesses used various terms to describe the defendant's allegedly nefarious underworld creditors, for the sake of convenience, we will borrow the defendant's argot and refer to them as the mob.) Later, his wife developed a disease in her fallopian tubes. She badly needed surgery but the defendant was unable to finance such medical treatment. He first turned to a pastor of his local church for assistance, but he met with no success. As a last resort, he desperately returned to his former employers, the mob, for the money. They obliged, and his wife's operation was financed. But then the mob demanded that its loan be repaid at a prodigious rate of interest. Moreover, he was told that failure to pay would result either in physical harm to himself and his wife and child, or in forcing him to leave his family and return to work for his former employers. Although he had but one payment remaining, he could afford no more. In hopes of escaping the mob, the defendant and his family sought refuge in Morton. But the mob had quickly discovered his whereabouts and demanded the final payment immediately. The defendant was unable to pay and his family again was threatened. Wright asked how much money the defendant needed. The defendant reluctantly replied that the final payment was $380. Wright said he would help. Although they did not discuss the terms for repayment, Wright considered the money to be a loan.

On Monday, March 23, Wright met the defendant at a Morton food store and handed him $380 in cash. The defendant then made a telephone call to the mob and was instructed to go to a Morton restaurant to make the payment. At 1 p.m., Wright drove the defendant to the restaurant and left. Instead of meeting the mob, however, the defendant had arranged to meet there with the Reverend Johnny Arnold.

As with Wright, the defendant had telephoned Arnold two days earlier and had asked to meet and discuss spiritual matters with him. At

the restaurant, the defendant told Arnold of his plight, whereupon Arnold asked how much the defendant needed to "get off the hook." The defendant replied that he needed $250, although he implied he needed much more, perhaps even $600. Arnold agreed to help the defendant. They drove to the bank where Arnold withdrew $250 and gave it to the defendant. He then had Arnold drive him to Peoria to make the payment. Arnold dropped the defendant off in front of a Peoria bank and waited. The defendant quickly left the bank, returned to Arnold's car, and told him that because the mob was out to lunch, there was no need for Arnold to wait. Thus, Arnold returned to Morton alone. The defendant then called Wright and informed him that the mob had taken him from Morton to Peoria and arranged for Wright to pick him up in Peoria. When the defendant entered Wright's car, he appeared shaken. He told Wright that he had just made the final payment and that he was finally free from the mob.

Two days later, the defendant called both Wright and Arnold, assured them that everything was fine, and inquired about attending Bible classes at their respective churches. Later that week, the defendant called Wright again and told him that he would repay the loan that day. When Wright asked the defendant for his address, he initially evaded answering, but finally gave an address which later proved to be false. After their March 23 meetings with the defendant, neither Wright nor Arnold saw the defendant again, nor did they receive any money from him.

Arnold, who testified first for the prosecution, said that although he disbelieved the defendant's tale of woe, he did believe the defendant was in need of money and, on that basis, gave him $250 on March 23. Because of this testimony, the court granted the prosecution's motion to dismiss one count for felony theft by deception which involved Arnold. Wright, on the other hand, testified that he believed the defendant's story and that had it not been for the story of threatened physical harm to the defendant's family, Wright would not have volunteered the money.

The remainder of the defendant's alleged victims then testified. As with Wright and Arnold, they were men who were either Morton church officials or closely involved with a Morton church. In each case, the defendant told the "victim" of his desperate plight after first talking about spiritual matters. In some cases, the defendant told them his wife had suffered from a neck injury instead of a fallopian tube disease. He also told several, but not all, "victims" that the money he needed constituted a final payment which would at last free him and his family from the mob's threats. To several "victims," the defendant identified himself as Tom Westland. As was the case with Arnold and Wright, the defendant never directly solicited the money; the "victims" asked what they could do to

help after hearing of the defendant's dilemma. Most considered the money only a loan and had expected repayment, but they had never discussed any of the terms. As with Wright and Arnold, the defendant usually called his "victims" a few days after receiving the money and assured them that the mob had been satisfied and that they would be repaid soon. With the exception of Arnold's testimony, each "victim" testified that he believed the defendant's story and that had it not been for that story, he would not have given the defendant any money. Each "victim" also testified that he had no knowledge that the defendant's story was false. In fact, they only became suspicious after police had contacted them and had told them that the defendant was a con artist who had fleeced other Morton persons with the same false story.

The final prosecution witness was Morton police officer Samuel Pearce, who interrogated the defendant on April 21. The defendant admitted he received money from the representatives of several churches, but he insisted that he had never asked for the money and that he intended to repay each creditor in full. He told Pearce that he had received "about $600" from three people and that he had used the money to pay his debts to "heavy people in Chicago," whom he refused to identify. This debt arose because of his wife's illness.

In fact, the prosecution established that the defendant had received slightly more than $2,200 from nine Morton people, that, although he was not married, he lived with a woman and child, and that he had repaid none of the $2,200.

The only evidence introduced by the defendant was a stipulation to three matters: first, that the court had dismissed the theft by deception charge involving Arnold; second, following the defendant's arrest, he filed an affidavit of assets and liabilities indicating that he owed $2,200 to several people; and, third, the stipulation noted that the defendant never posted bond and had remained in the custody of the police following his arrest.

■■ The charge in this case is theft by deception. One of the necessary elements of the offense is that the owner of money be induced to part with it. Another is that the *sine qua non* for the transfer of money be deception. Another is that the recipient intend to permanently deprive the original owner of the money. All three elements must be proven beyond a reasonable doubt.

There is no dispute here that the first element was proven. Certain persons were induced to part with money. A careful review of the evidence, however, discloses the State failed to meet its burden of proof on either of the other two elements, *i.e.*, deception and permanent deprivation. Thus, the convictions must fall.

■■ In order to sustain the deception element, it is necessary to show that the defendant's statements were false. There is no such evidence in the record. It is not the defendant's burden to prove the truth of his statements. The defendant is not required to prove his innocence. Was the defendant in debt to the mob? Did he need money to pay off the mob to avert harm? If his statements were true, they would not be deceitful. Were they true? Or were they false? From the record, it is impossible to say. The answer of the jury, in the absence of facts, was necessarily based on supposition, guess or conjecture. Such is not permissible to sustain a criminal conviction. In popular parlance, the defendant's representations to the men of the cloth would appear to be a cock and bull story. Mostly bull. That, however, is not the point. The point is whether the State proved the falsity of those critical statements. They did not.

The final element which the State failed to prove was that the defendant intended to permanently deprive the owners of their money. Preliminarily, it must be borne in mind that the defendant never even asked for money. He relayed a sob story it is true. It was the "victims" themselves, however, who volunteered the money. Although most of them considered the money to be a loan, they never specified when the defendant was to repay it. It is true that the defendant made declarations that the money would be repaid. Were these declarations false? This is not established by the record. The lack of repayment does not necessarily negate an intention to repay. If it did, all defaulting debtors would be guilty of theft. Such is not the law. While reasonable persons might suppose or conjecture that the defendant did not intend to repay these monies, proof of this element must meet the same evidentiary standard of guilt beyond a reasonable doubt that is applicable to every other element of the offense. There is no proof on this point.

For the foregoing reasons, we reverse the judgment of conviction entered in the circuit court of Tazewell County.

Reversed.

SCOTT, P. J., and ALLOY, J., concur.