THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DORVAN C. ROLSTON, Defendant-Appellant.

Third District   No. 82—426

Opinion filed April 25, 1983.

Robert Agostinelli and Frank W. Ralph, both of State Appellate Defender's Office, of Ottawa, for appellant.

John X. Breslin and Rita Kennedy Mertel, both of State's Attorneys Appellate Service Commission, of Ottawa, for the People.

JUSTICE ALLOY delivered the opinion of the court:

The defendant was charged with four counts of theft by deception. (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(b)(1).) The jury convicted him of all four counts and the trial court sentenced him to two terms of two years' imprisonment and one term of 2½ years' imprisonment with the sentences to run concurrently. The trial court also ordered the defendant to make restitution to his victims. The defendant appeals his conviction, sentence and order for restitution.

The primary prosecution witnesses were the victims of the alleged thefts: Scott Butcher, Leroy Swanson and James Houseman. According to their testimony, the defendant entered into contracts with each of them to install windows of their homes. These witnesses gave the defendant down payments for their orders, but he did not order the windows from the factory, nor install any windows in the homes.

Leroy Swanson testified that he contacted the defendant after seeing a newspaper advertisement. The defendant came to Swanson's home to demonstrate his windows. Several days later, on April 12, 1980, the defendant visited Swanson again and contracted with him for 12 replacement windows and one storm door. The total contract price for the windows and storm door was $3,332. Swanson gave the defendant $2,527 as a down payment. The defendant told Swanson, at the time they signed the contract, that the windows would not be ordered from the factory until the defendant sold a load (100) of windows. The defendant estimated that it would take three to four months to receive and install the windows. Swanson also testified that the defendant never misled him into believing the windows had been ordered. After four months, Swanson asked the defendant about the

delay, and the defendant explained that he still had not sold enough windows to comprise a load. Swanson also testified that he was always able to contact the defendant. In December 1980, Swanson asked the defendant to give him a check if he could not get the windows. The defendant replied that he had insufficient funds to refund Swanson's money. Swanson also testified that he contracted with the defendant for siding and a second storm door. The defendant completed this contract and also installed the storm door from the first contract in July 1980.

James Houseman testified that he contacted the defendant in July 1980. After one visit to demonstrate the windows, the defendant returned to Houseman's home to sign a contract. The total cost for these windows was $4,500. Houseman gave the defendant a first down payment of $1,000 and, approximately three weeks later, gave the defendant another $1,250. The defendant promised installation by October 15, 1980. Houseman could not remember whether the defendant informed him that he would not order the windows until he had sold 100 windows.

The defendant's brother, Gaylord Rolston, subsequently came to Houseman's home to take the measurements for the replacement windows. In September 1980, Houseman gave the defendant an extension for completion of the contract. The defendant explained to Houseman that he ordered the windows and that they were being manufactured.

Scott Butcher testified that Houseman introduced him to the defendant. Butcher wanted to purchase four storm windows, including one large enough to cover a sliding glass door. The defendant called the factory to find out if he could obtain a window that large. After completing the call, the defendant told Butcher that he could supply a window for the door. The defendant contracted to supply and install four storm windows for $636.50. Butcher paid the full amount.

The defendant promised to install Butcher's windows before the onset of the cold weather. Butcher did not remember whether the defendant initially told him that the windows would be ordered as part of a load, but the defendant later told him that they would be ordered that way. Six weeks later, in response to Butcher's inquiry, the defendant told him that the windows would be delivered soon.

In late November 1980, Houseman, Butcher and Swanson called Thermal Industries, the window manufacturer, to determine whether the defendant ordered the windows. When they discovered that the defendant had not ordered the windows, they contacted the defendant, who admitted that he did not order the windows and that he lied to them. The defendant told them he had not placed the orders be-

cause he was still waiting for enough windows to comprise a load.

Rosetta Thomas, another customer of the defendant, also testified for the State. Thomas contracted with the defendant in February 1980 for replacement windows. She paid him $2,375, but never received the storm windows. On cross-examination, Thomas stated that she signed a criminal complaint against the defendant, but the trial court dismissed that case at a preliminary hearing, ruling that it was a civil matter. Thomas subsequently sued the defendant and received a judgment against him.

Arthur Poland, the vice-president of Thermal Industries, testified that the defendant was an authorized dealer of windows. The defendant, his brother and another man received factory training at the company's Pittsburgh, Pennsylvania plant. Poland explained that a dealer, such as the defendant, would have to pay freight on all orders of less than 100 windows because they would be sent by common carrier. If, however, the defendant ordered 100 windows, the company would ship the windows itself. Poland also testified that any order placed by the defendant would have to be accompanied by one-third of the total price, with the balance payable on delivery. Poland verified that the defendant never ordered any windows.

The defendant principally relied upon the defendant's testimony. He testified that he had been a salesman for a variety of businesses for 27 years. Prior to opening his own business, he sold replacement windows for the Acri Company in the Quad Cities area. In 1980, the defendant started a replacement window business and became an authorized dealer for Thermal Industries. The defendant furnished an office in the basement of his home and began advertising in newspapers and the telephone directory. The defendant hired two women to work in his office and to act as telephone solicitors.

The defendant claimed that he took the orders from Butcher, Houseman and Swanson believing that he could fulfill the contracts. The defendant also testified that he used the money that he received from his customers to pay immediate business and living expenses, hoping to cover the cost of early orders with receipts of subsequent orders. From April 1980 to September 1980 the defendant took in $25,000, while his business expenses amounted to over $16,000. The defendant testified that orders for windows did not arrive as fast as he expected them to come in. He also claimed that he lied to Houseman and Butcher in order to take the pressure off of him, but that he believed that he would soon sell the windows needed to order a load. The defendant stated that he never intended to take money from his customers without delivering windows to them. He also stated that he

never avoided contact with them because he believes that he owes them refunds from the window orders. Since his arrest, the defendant has continued in the replacement window business.

Gaylord Rolston, the defendant's brother, testified that he installed siding and two doors on Houseman's home, pursuant to the contract between the defendant and Houseman. Gaylord Rolston also stated that he did not install any windows for the defendant during 1980, but that he did install 30 to 40 windows for the defendant in 1981. Ruth Wilson, an experienced telephone solicitor hired by the defendant, testified that they were unable to arrange appointments with prospective customers, even though they advertised extensively. Arthur Poland, testifying in rebuttal, did not remember whether the defendant called him to ask if Thermal Industries could make a window as large as Houseman's sliding door. Poland stated that if the defendant asked him about a window that size, he would have responded that it could not be made.

The defendant argues that the State failed to prove him guilty beyond a reasonable doubt. According to the defendant, the evidence raises a reasonable doubt that he obtained the money by deceiving the complainants and that he intended to permanently deprive them of the use and benefit of their money.

■ The State, of course, has the burden of proving each element of an offense. Whether the specific intent to defraud exists is a question of fact which does not have to be proved by direct evidence. Direct evidence of this intent is rarely available, so circumstantial evidence may be sufficient to sustain a conviction. (*People v. Ballard* (1978), 65 Ill. App. 3d 831, 382 N.E.2d 800, *cert. denied* (1979), 444 U.S. 925, 62 L. Ed. 2d 180, 100 S. Ct. 262.) Questions of fact and inferences to be drawn from the evidence are for the jury's determination. (*Ballard.*) Although the jury's determinations are entitled to great weight, a reviewing court still has an obligation to set aside a conviction when the evidence is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. (*People v. Reese* (1966), 34 Ill. 2d 77, 213 N.E.2d 526.) In the case at bar, we find that the State failed to sustain its burden of proof.

The State relies upon four facts to prove a pattern of deception and an intent to permanently deprive the customers of their money: The defendant failed to fulfill the contracts; the defendant failed to order the windows after receiving a down payment; the defendant cashed one down payment check; and the defendant lied to Butcher and Houseman concerning the status of their orders. In support of its position, the State cites *People v. Ballard* (1978), 65 Ill. App. 3d 831,

382 N.E.2d 800, and *People v. Moore* (1978), 65 Ill. App. 3d 712, 382 N.E.2d 810. In *Ballard,* the defendant sold tool distributorships to 12 people, promising them high quality tools, high volume retail outlets and a refund of their investments. The tools were of poor quality, the accounts were low volume outlets and the defendants failed to refund any money. The defendants testified that they wanted to succeed, but they did not have sufficient experience or capital to invest in the business. The court affirmed their convictions, noting that the evidence established that they intended to defraud the investors.

Significantly, in *Ballard* the facts indicate that the defendants knew they would never fulfill the contracts. One defendant was president of the tool company that he was selling distributorships for, and another defendant was a consultant for that company. Therefore, they must have known the quality of tools and accounts that they were sending to their investors.

Similarly, in *Moore,* the defendant sold candy and tape distributorships to investors using representations that were comparable to those employed in *Ballard.* As in *Ballard,* the accounts were of low quality or nonexistent, the merchandise did not sell and the defendant failed to make any refunds. Additionally, that defendant gave investors false references, avoided contact with them after the distributorships started to fail and failed to make promised refunds of money.

Undoubtedly, there are similarities between *Ballard, Moore* and the case at bar. To affirm the conviction here, however, would require this court to look at the State's evidence in a vacuum. A defendant's failure to fulfill a contract is not proof of a specific intent to defraud. (*People v. Jensen* (1982), 103 Ill. App. 3d 451, 431 N.E.2d 720 (failure to repay loan is not proof of intent never to repay loan).) Moreover, cashing a check to cover expenses proves nothing. A businessman who receives a down payment can be expected to utilize that money. Even if the funds are used for the proprietor's personal expenses, that action is no proof of felonious intent; after all, there is no substantial difference between cashing the check directly or depositing the check first and drawing a legitimate salary through the use of those funds later. Furthermore, the defendant's uncontradicted testimony of his need to meet immediate expenses explains his inability to refund the money to his customers. Again, a failure to refund money to dissatisfied customers is not necessarily proof of a specific intent to defraud. (*Jensen.*) Thus, we are left with evidence of the defendant's failure to order the windows and his false statements to customers explaining the delays.

■ Although this circumstantial evidence is damaging to the

defendant, it is overcome by the remaining evidence in this case. The defendant went with two other men to the Thermal Industries plant in Pittsburgh to receive professional training. There is no evidence indicating that Thermal Industries is anything other than a legitimate, reputable manufacturer. The defendant became an authorized dealer of this company and embarked on selling a reputable product. (Compare *Ballard* (the defendants knew or should have known the poor quality of tools and accounts).) It is uncontradicted that the defendant here put most of the money he received back into the business, spending a great deal of money on advertising. The defendant partially performed one contract and fully performed another contract with one of the complainants, and has never denied owing the customers their money or the windows. He has always been available to his customers and did not try to avoid them or their complaints. The defendant reasonably explained his failure to order the windows separately. If the defendant ordered 100 windows, he avoided the freight costs and the company would ship them in special trucks designed to minimize the risk of breakage. The State's own witness, Arthur Poland, supported him on this point. Finally, the defendant has continued his business, with apparent improvement in sales, installations and business procedures.

As we noted at the outset, a jury's decision is entitled to great weight and respect. The evidence produced at trial, however, raises a significant doubt of the defendant's guilt. The record in the case fails to establish guilt beyond all reasonable doubt. In this situation, we have a duty to reverse the conviction. (*Reese.*) Our disposition of this issue makes it unnecessary to rule upon the remaining issues that the parties raise in this appeal.

Accordingly, the judgment of the circuit court for Whiteside County is reversed.

SCOTT and BARRY, JJ., concur.