THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
A. WENDELL WHEADON, Defendant-Appellant.

Fifth District No. 5—87—0469

Opinion filed November 7, 1989.

GOLDENHERSH, J., dissenting.

Daniel M. Kirwan and Rita K. Peterson, both of State Appellate De-
fender's Office, of Mt. Vernon, for appellant.

John Baricevic, State's Attorney, of Belleville, and Allen F. Bennett &

Associates, of Decatur (Kenneth R. Boyle and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, and Garry W. Bryan, of counsel), for the People.

JUSTICE RARICK delivered the opinion of the court:

Defendant, A. Wendell Wheadon, was found guilty in the circuit court of St. Clair County of theft over $300 by deception (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(b)(1)) and was sentenced to two years in the Department of Corrections. On appeal, defendant raises the issue whether the State proved him guilty of theft by deception beyond a reasonable doubt. This court affirms.

The facts adduced at trial indicate that on January 11, 1984, members of the Stites Township Park District Board (Board) held a special meeting. The Board was in a state of turmoil and was split into two factions, one of which consisted of Alfred Caldwell, Marva Collins, and Wendell Marshall. According to Wendell Marshall, he was told he was going to be appointed to the Board, but was never actually sworn in. He was present at the January 11, 1984, meeting and these three members discussed the renovation of the Park District building. Other Board members, Arthur Singleton and Edwin O'Bannon, were not present. Defendant, attorney for the Board, was present at the meeting. A vote was taken and it was decided that $5,000 would be issued to defendant for him to seek repairs on the district's dilapidated building at 500 Madison in Brooklyn. In addition to being the Board's attorney, defendant is also a licensed engineer. The check for $5,000 issued on January 12, 1984, was made payable to "Denverside Realty," a company defendant claimed to have operated. The minutes kept by the Board established that the $5,000 check was issued to defendant for him to:

"Prepare specifications for the repair of the District's building;

Seek bids to perform the work;

Prepare contracts for the work;

Let the contracts;

Inspect the work;

Receive funds for all work, materials and services;

Make disbursements to pay for such work;

Make an accounting and report to the board for all activities related to the rehabilitation of the District's building;

Enter into negotiations and sign agreements and contracts relating to the above and with Illinois Power Company concerning lights and gas for the building;

Repairs are to be made to at least the following: door, furnace and/or switches, roof, lights, caulking;

Cost of all materials, labor and services not to exceed $5,000.00."

With respect to his duties on this project, defendant first placed a public notice in the East St. Louis Monitor on January 26, 1984. The legal notice informed the public that the Board was accepting proposals for the rehabilitation of the Park District building. According to defendant, he told Alfred Caldwell, a member of the Board at that time, that he was placing the bid and that he should expect bids to be presented to him; however, the name Sefred Caldwell was placed in the notice, not Alfred Caldwell. Bids on the project were due, according to the ad, on February 13, 1984, at Village Hall, Brooklyn. This is Alfred Caldwell's work address.

According to defendant, on February 13, 1984, he contacted Caldwell to learn if any bids had been received. Defendant was informed that no bids had been received. Defendant then contacted Robert F. Blackburn, a general contractor, Forest McGraw, a general contractor, and an electrician whose name defendant could not remember, about the project. Blackburn testified that he was contacted by defendant in late 1983 or early 1984 "to get some figures" on a building at Fifth and Madison Streets. He inspected the building and gave defendant an estimate of what the cost would be for the structural damage he detected. Defendant told him it was a rush job and that they needed to secure the building as quickly as possible. There was a lock on the front door, and defendant told Blackburn the name of someone to contact at the police station to get the key, but Blackburn was unable to obtain a key. Blackburn did not get paid for estimating the job, as that cost is generally deducted from the contract. Blackburn estimated that he spent a total of 2½ hours total on this job. As Blackburn was never given money to start on the job, he never began work on rehabilitating the building. McGraw's inspection of the building was limited to a visual examination of the exterior, after which he gave defendant a verbal estimate on the brick work.

After defendant received replies from Blackburn and McGraw, he testified that he made arrangements with Illinois Power Company to reconnect the lights so that the electrician could inspect the building. A new lock had been placed on the door, and neither the electrician nor Illinois Power could gain entry. At this point, according to defendant, he was prepared to meet with the Board, but the Board became embattled in litigation, members against members, and was ultimately abolished and a new Board put in place.

In mid-January of 1984, Bob White, an investigator with the St. Clair County State's Attorney's office, was investigating another matter at a local bank when he learned from a bank employee of the $5,000 check issued to Denverside Realty and cashed by defendant. Further investigation revealed that $3,000 of this check was placed on deposit in a checking account at Southern Bank of Illinois in Fairview Heights in an account in the name of. Denverside Realty. Two money orders were purchased for $299 and $250, respectively. $1,450 in cash was returned to defendant. The $250 money order was subsequently cashed by defendant, and the $299 money order was presented to the Mansion House in St. Louis, Missouri. During January 1984, six checks cleared the account; five checks were signed by, payable to, and cashed by defendant. One check for $250 was presented to Auffenberg Ford. On February 1, 1984, a check for $30 was cashed, leaving a balance of $17.20. In February 1984, a deposit of $3,500 was made. In March 1984, six checks cleared the account. The bank was unable to examine the account further because the bank equipment failed.

White also investigated the Denverside Realty & Development Company and discovered through the recorder of deeds office in St. Clair County that the company had gone out of business several years ago. He was given the last listed address for the company. The address turned out to be a commercial building. White made several attempts to find someone at the building, but attempts were unsuccessful.

Defendant admitted that he had cashed checks on the Denverside account, but he did not consider the money to be public money. He considered the $5,000 to be his fee for rehabilitating the building. Marva Collins, Alfred Caldwell, and Wendell Marshall all gave different accounts of what the $5,000 was to be used for.

It was Ms. Collins' understanding that defendant would not actually do the work. He would determine the costs of the repairs and report back to the Board. There was to be a follow-up meeting to approve having the work done, but Ms. Collins did not attend any more meetings. She is no longer a member of the Board.

Alfred Caldwell testified that Mr. O'Bannon and Mr. Singleton were in the room, but did not participate in the meeting. Caldwell agreed with Ms. Collins that a check for $5,000 was given to defendant, but said it was to cover expenses of getting the work done. It was not a salary for defendant. Defendant was to bring bids to the Board on the work to be done. Mr. Caldwell never heard what happened to the $5,000 and did not receive bids for the work. He attended two or three meetings after the issuance of the check, but he is no longer a member of the Board.

Wendell Marshall agreed that he attended the January 1984 meeting but could not recall if he ever voted, although he thought a vote was taken. He did remember that Ms. Collins, Mr. Caldwell, and defendant discussed how the $5,000 was to be used.

Edwin O'Bannon testified that he was not at the meeting on January 11, 1984. He agreed that the Board was having difficulties and had been brought before the grand jury sometime before January 1984. It was his opinion that the Board had been given instructions not to conduct Park District business unless it was approved by the State's Attorney's office.

Defendant had recently been convicted of conspiracy to defraud, bribery, embezzlement, and tax evasion in Federal court. He had no records to indicate that he reported the $5,000 as income to the Federal government through tax forms. As of the date of the trial, defendant had not completed his 1984 tax returns, but had asked for an extension.

Defendant specifically argues there was insufficient evidence of deceit or criminal intent to prove him guilty beyond a reasonable doubt; therefore, his conviction must be reversed. According to defendant, the evidence raises a reasonable doubt that he obtained the $5,000 by deceiving the Board and that he intended to permanently deprive the Board of the use and benefit of its money.

■ The State has the burden of proving each element of an offense. Elements of the offense of theft by deception are that the owner of the money be induced to part with it, that the transfer of money be by deception, and that the recipient intend to permanently deprive the original owner of the money. (*People v. Jensen* (1982), 103 Ill. App. 3d 451, 454, 431 N.E.2d 720, 722.) There can be no question that the Board was induced to part with $5,000; and indeed, Wheadon raises no argument with respect to this element. Wheadon instead argues that there was insufficient evidence that he deceived the Board or that he intended to permanently deprive the Board of the money.

The minutes of the January 11, 1984, Board meeting clearly specify the tasks defendant was hired to do. Although the various Board members gave conflicting testimony as to their recollection of the meeting, the minutes themselves clearly indicate that the $5,000 was to pay for the repair work and was not a fee for the defendant. The only task defendant performed, however, was to run ads in the newspaper seeking bids and to consult with two general contractors. Although given estimates, the defendant took no action on them, nor did he seek other estimates. Over the next 2½ years he did nothing. Immediately after receiving the $5,000 check, issued to a company which

no longer existed, defendant converted the money to his own personal use. Defendant argues that failure to fulfill a contract is not proof of intent to defraud, but the evidence demonstrates that Wheadon did more than simply fail to perform on a contract. A check was issued to pay for repair work on the building, and the minutes of the meeting make clear that the money was to pay for the work. Wheadon, however, immediately converted the money to his own use and made only a token pretense of fulfilling the contract.

Wheadon points to a letter written in June 1984 as evidence of his lack of felonious intent. Defendant testified that in May 1984, he learned that an *ad hoc* committee had been created. Defendant knew one of the *ad hoc* members, Mr. Howard, so defendant wrote to him about defendant's involvement in the project. The letter, written on Denverside Realty & Development Construction Management Division letterhead and addressed to Stites Township Park District, c/o Mr. Willie Roy Howard, 715 Washington, Brooklyn, Illinois, 62059, reads as follows:

> "Dear Sir:
>
> It has recently come to my attention that the Stites Township Park District 'Board of Commissioners' are discussing ways and means of rehabilitating the current District Building.
>
> Please be advised that Denverside Realty and Development has been retained to prepare the specifications and rehabilitation plans, prepare pre-bid documents, administer the bidding process and inspect the work to be done and perform other services as directed. Denverside Realty and Development received a partial retainer to perform this work and has expended many hours in planning the job.
>
> Be further advised that Denverside Realty and Development stands ready to meet with your board or any other group to discuss the plans and scheduling of the work."
>
> Yours truly,
> /s/ A.W. Wheadon
> A.W. Wheadon"

Although Wheadon testified that he considered the $5,000 a fee for performing these services, the minutes of the Board meeting make clear that the $5,000 was to cover the total cost of the project and was not a "partial retainer" to compensate Wheadon for pushing paper. We also note that this letter was written several months after the investigation had started. In light of the minutes of the Board meeting, and given Wheadon's immediate conversion of the money to personal use, and his almost total lack of effort to have the work done, this letter is

of little persuasive value.

 The determinations of a trial court are entitled to great deference, and a finding of guilty cannot be set aside on review unless the court's finding is "palpably contrary to the [evidence] or so improbable or unsatisfactory as to cause reasonable doubt as to the guilt of the accused." (*People v. Nix* (1985), 133 Ill. App. 3d 1054, 1059, 479 N.E.2d 1147.) We find it impossible to so conclude. It is not for a court of review to reweigh the evidence and substitute its own judgment for that of the trial court. The evidence must be reviewed in a light most favorable to the prosecution, and the conviction must be affirmed if any rational trier of fact could have found the defendant guilty based upon the evidence presented. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) After reviewing the evidence, we conclude that it is sufficient to support a finding of guilty and therefore affirm the conviction.

The judgment of the circuit court of St. Clair County is affirmed.

Affirmed.

CHAPMAN, J., concurs.

JUSTICE GOLDENHERSH, dissenting:

This appeal involves a series of facts which the majority opinion concludes is sufficient to prove defendant guilty of theft over $300 by deception. (Ill. Rev. Stat. 1985, ch. 38, par. 16—1(b)(1).) I do not agree with that conclusion. I, therefore, respectfully dissent. There is no dispute that the first element of the offense was proven. The Board was induced to part with $5,000. After carefully reviewing the evidence, however, I find that the State failed to meet its burden of proof on either of the other two elements, deception and permanent deprivation, so the conviction must, therefore, be reversed.

In order to sustain the deception and permanent deprivation elements, it is necessary to show that defendant deceived the Board into giving him the $5,000 and had no intention of ever rehabilitating the building. Undoubtedly, defendant's almost immediate conversion of the $5,000 is damaging. So, too, are the minutes of the January 11, 1984, meeting which clearly set out the tasks defendant was hired to do. However, even the Board members in attendance at that meeting were not in agreement about defendant's role in the rehabilitation of the building. Finally, the investigation into the Denverside Realty Company done by the St. Clair County State's Attorney's office was damaging to defendant. In affirming the conviction, however, the majority

almost totally ignored defendant's evidence. A defendant's failure to fulfill a contract is not proof of a specific intent to defraud. (*People v. Rolston* (1983), 113 Ill. App. 3d 727, 448 N.E.2d 965; see also *People v. Jensen* (1982), 103 Ill. App. 3d 451, 431 N.E.2d 720.) Moreover, a business man who receives a down payment can be expected to utilize that money. Even if the funds are used for the proprietor's personal expenses, that action is not proof of felonious intent. 113 Ill. App. 3d at 732, 448 N.E.2d at 968.

Although the circumstantial evidence is damaging to defendant, I find that the State failed to prove that defendant intended to permanently deprive the Board of the money. Defendant's actions following his receipt of $5,000 constitute a reasonable doubt. Criminal intent and deception are lacking where defendant placed an ad in a newspaper requesting proposals for bids on the rehabilitation of the Park District building. Although no bids were submitted, this does not necessarily mean defendant was not doing his job. There is a fair inference that no one was interested in the work offered. The letter written to the Board in care of Mr. Howard is dispositive of the fact that defendant had no criminal intent. Had he intended to deprive the Board permanently of its $5,000, no letter would have ever been written.

The majority finds this letter to be of little persuasive value because it was not written until June 1984, and the State's Attorney's office learned of the $5,000 check sometime in the middle of January. What the majority opinion fails to consider is the complete disarray the Board was in at this time. The State's investigation in January was directed toward the Board itself, not defendant. Had defendant not written a letter to the *ad hoc* Board explaining his receipt of $5,000, apparently no action would have been taken against defendant. Once the Board was made aware of this disbursement to defendant, it made no attempt either to get back the $5,000 or to have defendant complete the work. Defendant received no reply to his letter until nearly 10 months later when he was indicted on this charge.

By this dissent, I do not mean to infer that I condone defendant's actions. As an attorney on retainer, he certainly owed more to the Board than he provided them. However, as an attorney, he cannot be held to any higher standard as a criminal defendant. While reasonable persons might suppose or conjecture that defendant did not intend to do the work, proof of this element must meet the same evidentiary standard of guilt beyond a reasonable doubt that is applicable to every criminal offense. The State failed to prove beyond a reasonable doubt that defendant obtained the money by deception and that he intended to permanently deprive the Board of its money.