THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD BERKE, Defendant-Appellant.

First District (3rd Division)   No. 1—90—1849

Opinion filed September 30, 1992.

Craig D. Tobin, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, Richard Berke, was indicted on 184 counts of felony theft from the City of Chicago (City) from 1980 to 1985, totalling approximately $100,000, under two criminal statutes: theft by deception (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(a)(2)) and theft by unauthorized control (Ill. Rev. Stat. 1979, ch. 38, par. 16—1(a)(1)). Following a bench trial, defendant was acquitted of all the counts of theft by deception, but was convicted of 76 counts of theft by unauthorized control. He was sentenced to 30 months' probation with the condition that he perform eight hours of community service per week. We affirm.

The indictments resulted from defendant's dentistry practice, which was mostly City employees, and his payment claims for future dental work to be performed, but never completed. On appeal, defendant asserts that this is a civil matter and no crime is involved. The State maintains that this is a criminal matter.

The issue in this case is whether a dentist, who fails to complete dental work for which he submits specific claims and receives payment, is liable for theft and is not merely a contractual dispute.

Dr. Berke, a licensed dentist, performed dental work under the City employee dental plan. When the City instituted its employee dental plan in 1980, Blue Cross/Blue Shield administered the self-insured plan. Two years later, Bankers' Life and Casualty Company began administering the plan with Blue Cross/Blue Shield. Under the terms of the plan, either the dentist or the patient could submit a dental claim on insurance claim forms. The insurance company would review the claim, pay out the appropriate amount of money, and be reimbursed by the City. The employee had the option of paying his dentist and seeking reimbursement or having his dentist seek payment directly from the plan. As a result of his dental claims, defendant received $208,000 in 1982, $891,000 in 1983, and $309,000 in 1984 from the City.

In 1984, defendant testified before the city council concerning Bankers' failure to pay him. On January 14, 1985, the City's corporation counsel's office asked the Chicago police department financial crimes unit to investigate defendant for suspected fraud. As part of that investigation, police officers spoke with City employees who were defendant's patients to determine if the work defendant claimed to have provided had actually been done. Then, in November 1985, defendant filed a lawsuit against Bankers', the City, and Dr. Randall.

Several patients testified, either through direct testimony or by stipulation, about the treatment that defendant provided for themselves and their families. They explained work not completed by defendant and how other dentists finished some of that work. The patients' charts, claim forms, and payments to defendant were entered into evidence by stipulation.

The State presented several expert witnesses. Dr. Steven Randall, a dental expert, reviewed several of defendant's claims that were part of the indictment. It was stipulated that Dr. Randall began his review after defendant sued him and the City for nonpayment of 1984 and subsequent claims. It was also stipulated that the review began after other dentists filed claims for purported work

done and paid to defendant. Dr. Randall testified that defendant submitted several claim forms for which the dental work claimed on specific dates had not been done.

Dr. Randall also explained that it was reasonably common for dentists to bill for treatment in progress when it reaches an irreversible state of completion. Most insurance companies would not accept a claim before that point, he stated, and anticipated treatment would generally not be billable.

Dr. Robert Sommerfeld, a dentistry expert, examined several of defendant's patients to determine if the work for which defendant claimed payment had actually been provided. Dr. Sommerfeld compared defendant's payment claim forms with the work done on those patients. Wherever gold onlays were not installed, Dr. Sommerfeld concluded that the work had not been completed or was finished by other dentists.

Edward Radwinski, a Bankers' group claims supervisor, testified that Bankers' made payments when all services had been completed. Under no circumstances, he stated, would Bankers' authorize payment before completion.

The claim forms for dental reimbursement from Bankers' contained the certification:

> "I hereby certify that the procedures as indicated by date have been completed."

Defendant testified that 90% of his practice from 1980 through 1984 was City employees. Defendant and his staff saw 65 to 75 patients a day and treated thousands of patients between 1980 and 1984. The office was open six days a week from 6:30 a.m. to 7:30 p.m. and on Saturdays from 6:30 a.m. to 4 or 5 p.m.

In his reconstructive dentistry practice, defendant explained, patients were examined, X-rayed, and a long-term treatment plan was established. The treatment plan would be charted and recorded on the insurance form. All patients were X-rayed and the X rays accompanied the claim form so that the insurance company could evaluate the work. Defendant testified that he listed on the claim form all the work that he intended to do. Often, the work was not complete at the time the form was submitted. Defendant maintained that he intended to finish all the work for which he submitted claim forms.

Defendant stated that his laboratory fees were between $250,000 and $600,000 a year, which he was required to pay. The majority of defendant's products installed in patients' mouths were

made in the laboratory. Instead of using silver to fill patients' teeth, defendant always used gold onlays.

Defendant testified that he received payments within three to four weeks when Bankers' initially became involved in the dental plan. In 1983, however, the turnaround time slowed to two to three months and then, six to seven months. Defendant continually complained, advising Bankers' that the work claimed had not been finished and that he must be funded to be able to complete the work. At first, Bankers' explained that their late payments were a result of computer problems. Later, they said payments were not made because not all the work claimed on the forms was completed. Defendant contends that he never concealed the fact that the work was not completed.

Defendant then contacted the city department of insurance, informing them that payments from Bankers' were very slow, that his work on patients was not completed, and that it could not be completed if he did not get payments within a reasonable amount of time. Kay Berman of the City's health insurance benefit office acknowledged receiving defendant's complaints concerning Bankers' failure to pay him. When defendant came to her office with a suitcase full of unpaid bills, he readily acknowledged that the work on the patients was not finished. Berman presented a letter from defendant that explained the discrepancies in the payment practices of Bankers' and Blue Cross/Blue Shield and his need to have payment to complete his work.

A meeting was held between defendant and Leonard Utecht, the City's former assistant comptroller of insurance, Ira Edelson, the City's acting director of revenue, and 10 to 12 other City employees. The purpose of the meeting was to discuss the City's position on the appropriate time for defendant to bill the City for future services. During the meeting, defendant explained that his practice consisted mostly of City employees, that he ran his practice like an HMO, that some of the work was not finished, that he would have to be funded on a regular basis to complete the work, that he was having problems with Bankers', and that his practice was suffering. Defendant testified that the City officials told him there was no reason why he should not be paid and compensation would be forthcoming.

Defendant further testified that he considered the claim form as a claim for treatment plans, long-range goals to be completed. He did not think that submitting the claims for work not done was a problem until late 1983. He admitted that he submitted claims be-

fore any work was begun and that he was paid for work he did not do.

In an effort to get paid, defendant had three or four meetings with William Heckler from Bankers' in 1984. Heckler testified that the City could authorize prepayment to dentists prior to the completion of all the work.

Dr. John Thorpe, the dental director of Blue Cross/Blue Shield, testified that there was no uniformity as to when dentists would present their claims. There were four theories that dentists had for when they could submit their claims: (1) when the patient agreed to the contract; (2) when an irreversible procedure began; (3) if a laboratory bill was incurred; or (4) when impressions were taken for work to be performed in the laboratory. Although many insurance companies had a policy of paying claims only after the work was completed, the professional community does not generally agree with those standards. Dr. Thorpe did not know of uniformity within the insurance industry concerning the appropriate time for the submission of claims.

The Blue Cross/Blue Shield claim form contained the dentist's certification:

> "I hereby certify that the services listed below have been or will be provided by me."

Although it was their policy for work to be completed before submitting a claim for payment, the form included a separate box to check "estimate" if work was contemplated, and a separate box to enter a date when service was completed. Defendant checked the box for actual charges for completed work for each count he was found guilty by the trial court.

Dr. Thorpe stated that onlays are the best type of restoration available and that gold is the best material to use in an onlay. Dr. Thorpe testified that a portion of the dental research community thinks that the use of other materials could be deleterious to a patient's health.

Dr. Thorpe further stated that defendant was recognized as a hard-working, skillful, hard-practicing dentist, who was a believer in using gold onlays. In his capacity as dental director, Dr. Thorpe visited defendant's office in 1977. He found that defendant's standards were in accordance with generally accepted standards and that his offices were set up to deliver a high volume of services.

Dr. Peter Lio, an endodentist and Loyola University professor, and Dr. Pearlman, an oral surgeon, both testified that they reviewed the treatment forms that were submitted by defendant with

the claims. Both dentists concluded that all the claims were medically necessary, justifiable, and of the highest medical care.

Emanuel Katten, the trustee for defendant's bankruptcy case, testified that defendant filed for bankruptcy in 1985. At that time, he had $19,400 in outstanding dental claims pending with the City. Katten did an extensive review of defendant's tax returns, his dental and billing practices, client records, and the payment practices of various insurance companies. While supervising defendant's practice, Katten went to defendant's office at least twice a week and was involved for approximately 18 months. Pursuant to a five-month audit from January 1, 1985, to May 31, 1985, Katten found that defendant netted over $132,000 from his business during that time. Katten did not know how that money was used. He determined that not all the work in the claims had been completed.

Leonard Utecht testified that he approved payment to defendant by Blue Cross/Blue Shield with full knowledge that the work on the invoices had not been completed. Utecht stated that his predecessor had done likewise. Defendant had told Utecht that he billed the City after he began the work when it was 30% to 35% completed so that he would have payment when the work was 65% to 75% completed. Their meetings did not involve all claims nor did it include any Bankers' claims. Utecht also testified that it was his understanding that, when defendant included a date service was performed on the Blue Cross/Blue Shield claim forms, the service was completed. When the date was left blank, the service was not completed.

Michael Moss, an attorney and certified public accountant, testified that he reviewed defendant's financial status in 1983. At that time, defendant was forced to start borrowing money because he was not being paid by the City. From 1982 to 1984, defendant's receivables began to increase, but those were the claims pending against the City. Defendant's financial situation continued to decline until mid-1984, when he sought protection of the bankruptcy court.

Several witnesses attested to defendant's good character and reputation in the dental profession. Dr. Scott Shore, a consultant to the Illinois and Wisconsin Boards of Dental Examiners, Dr. Peter Lio, a Loyola University professor of dental medicine, and Dr. Henry Crossetti, the Northwestern Dental School dean, gave their opinions of defendant's honesty and professionalism. Also testifying to defendant's character and reputation were retired Judge Joseph Wosik, retired judge and former State Senator Robert J. Egan, Alderman Victor Vrdolyak, Chicago Police Department Commanders

Charles B. Roberts and James Mauer, and Chicago police officers Clarence Schuey, Donald Eichler, Robert Lee Hinman, Dennis Isola, Alfred Nagote, and Detective James Hennelly. Chicago Fire Department Battalion Chief William Kugelman testified that defendant had volunteered for a program donating his dental services to the family members of fallen firemen.

In the State's rebuttal case, Walter Knorr, city comptroller and chief financial officer, testified that claims were not to be paid until the work was completed. Although Utecht was on the comptroller's payroll, Knorr stated, he had no authority to authorize exceptions to the dental plan, although the City and Knorr's committee could make such exceptions.

The trial court acquitted defendant of all the charges of theft by deception. Although the trial court believed that there was some deception involved, it concluded that defendant was not guilty of theft by deception since he readily admitted to everyone that the work for which he billed was not completed. The trial court also acquitted defendant on those counts where the evidence established that the work had been completed by defendant. Defendant was convicted of 76 counts of theft by knowingly exerting unauthorized control over the City's money. The court decided that defendant never intended to finish the work that had been stated in the claim form and that his intent was to use the money for his own benefit.

The day before defendant's sentencing, defendant and the City settled their civil case. Defendant agreed to pay the City $250,000, $100,000 of which related to the claims involved in the indictment. After denying defendant's post-trial motions, the trial court sentenced him to 30 months' probation with the condition that he perform eight hours of community service per week.

The issue is whether defendant's actions constituted theft as defined in the statute or whether the relationship was a debtor-creditor relationship for which no criminal conviction can stand. Defendant asserts that his debtor-creditor relationship with the City meant that any payment owed the City was a contractual dispute, not theft. (*People v. Buffalo Confectionery Co.* (1980), 78 Ill. 2d 447, 459.) Because of that relationship, defendant argues, he was not guilty of theft. (*Buffalo Confectionery Co.*, 78 Ill. 2d at 459.) However, all the cases defendant relies on to support his argument are factually distinguishable. See *Buffalo Confectionery Co.*, 78 Ill. 2d 447; *People v. Becker* (1953), 414 Ill. 291; *People v. Streich* (1935), 361 Ill. 490; *People v. Parker* (1934), 355 Ill. 258; *People v. Robinson* (1933), 352 Ill. 596; *Mulford v. People* (1891), 139 Ill. 586; *Peo-*

*ple v. Davis* (1989), 189 Ill. App. 3d 815; *People v. Rolston* (1983), 113 Ill. App. 3d 727; *People v. Jensen* (1982), 103 Ill. App. 3d 451.

We reject defendant's argument that this case is a civil matter and no crime is involved. Defendant admitted that he filed claims for dental work before he began the work even though some of the claim forms indicated that the work had been completed. The Bankers' claim form contained the certification:

"I hereby certify that the procedures as indicated by date have been completed."

Not only did defendant prematurely bill for future dental work, but he did not perform that work even years after receiving payment.

■ In Illinois, a person commits theft when he knowingly:

"(a) Obtains or exerts unauthorized control over property of the owner; [and]

(1) Intends to deprive the owner permanently of the use or benefit of the property." Ill. Rev. Stat. 1981, ch. 38, par. 16—1(a)(1).

■ We conclude that the State proved beyond a reasonable doubt that defendant exerted unauthorized control over the City's money and intended to permanently deprive the City of that money. Four to nine years after defendant claimed in writing that the dental work had been performed, the work still remained to be performed.

Although defendant and City had a debtor-creditor relationship, the criminal prosecution for theft was not instituted to collect a debt. (*Buffalo Confectionery Co.*, 78 Ill. 2d at 462.) Therefore, the conviction is not barred because there was also a civil dispute over defendant's dentistry practices.

Based on the foregoing, the circuit court judgment is affirmed.

Affirmed.

GREIMAN, P.J., and TULLY, J., concur.