2003 WY 124

**Henry MASCARENAS, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 01–225.**

Supreme Court of Wyoming.

Sept. 30, 2003.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel.

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; and D. Michael Pauling, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, and VOIGT, JJ; and BURKE, D.J.

HILL, Chief Justice.

[¶ 1] Henry Mascarenas (Mascarenas) challenges his conviction for felony interference with a peace officer in violation of Wyo. Stat. Ann. § 6-5-204(b) (LexisNexis 2003) on the grounds that there was insufficient evidence that the police officer was engaged in the lawful performance of his official duties or that the officer suffered bodily injury. He also claims that the State failed to disclose material, exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Kerns v. State,* 920 P.2d 632 (Wyo.1996). We find

sufficient evidence in the record to support the conviction and conclude that Mascarenas has failed to demonstrate a *Brady* violation. We affirm.

## ISSUES

[¶ 2] Mascarenas states the following issues:

I. Was [Mascarenas's] arrest unlawful, as the police had no probable cause to arrest [him] (which was admitted by the charging officer); and as a result, was there insufficient evidence to convict [him]?

II. Was there insufficient [evidence] to convict [Mascarenas] as the alleged victim/officer did not suffer "physical pain"?

III. Did the State fail to disclose exculpatory evidence, warranting reversal?

The State condenses the issues into two:

I. Was the evidence presented by the State sufficient to support [Mascarenas's] conviction?

II. Did the State fail to disclose material exculpatory evidence?

## FACTS

[¶ 3] The main issue Mascarenas raises in this appeal is whether or not the evidence is sufficient to sustain his conviction for interference with a peace officer. When considering claims related to the sufficiency of the evidence, we review the record:

[assuming] that the evidence favoring the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence.

*Howard v. State*, 2002 WY 40, ¶ 29, 42 P.3d 483, ¶ 29 (Wyo.2002) (quoting *Lucero v. State*, 14 P.3d 920, 924 (Wyo.2000)). In assessing the sufficiency of the evidence, we neither reweigh the evidence nor re-examine the credibility of the witnesses. *Curl v. State*, 898 P.2d 369, 375 (Wyo.1995).

[¶ 4] On December 31, 2000, the Rawlins Police Department received a call from an unknown person that a fight between Mascarenas and the bartender was in progress at the Wyoming Bar. The caller specifically identified Mascarenas by name. When the police arrived, there was shattered glass on the floor from a neon sign. It was later determined that the sign had broken when Mascarenas had stumbled into it while the bartender was unsuccessfully attempting to escort him from the premises. The officers spied Mascarenas standing by the bar engaged in a heated verbal argument with the bartender. Officer Davis asked the bartender what was going on and was told that Mascarenas had been asked to leave because of his intoxication but that he had refused to exit the premises.

[¶ 5] Officer Davis and Officer Grauberger asked Mascarenas to step outside and talk to them. Mascarenas ignored the officers and pulled away when Officer Davis attempted to grab his arm to escort him outside. Mascarenas then gripped the bar and refused to move. Two additional officers had arrived and they, along with Officer Grauberger, pried Mascarenas's fingers from the bar and took him to the floor to cuff his hands behind his back. At that point, Officer Davis informed Mascarenas that he was under arrest for "fighting in public."

[¶ 6] Officer Grauberger began to search Mascarenas for weapons. The officer placed Mascarenas's personal items, such as his cigarettes and wallet, on the floor as he proceeded with the search. This apparently upset Mascarenas who responded by stomping on his cigarettes and saying, "Here are my cigarettes, here are your balls," whereupon Mascarenas kneed Officer Grauberger in the groin. In response, the officers took Mascarenas to the floor again and placed him in leg restraints.

[¶ 7] Mascarenas was charged with one count of intentionally causing bodily injury to a peace officer engaged in the lawful performance of his official duties in violation of Wyo. Stat. Ann. § 6–5–204(b) (LexisNexis 2003).[1] After a trial, the jury returned a guilty verdict.

---

1. § 6–5–204. Interference with peace officer[.]
   . . . .
   (b) A person who intentionally and knowingly causes or attempts to cause bodily injury to a peace officer engaged in the lawful performance of his official duties is guilty of a felony punishable by imprisonment for not more than ten (10) years.

## DISCUSSION

■ **[¶ 8]** Mascarenas challenges the sufficiency of the evidence supporting two elements of interference with a peace officer. In his initial claim, Mascarenas contends that the evidence does not support a conclusion that the officer was engaged in the lawful performance of his official duties when Mascarenas kneed him in the groin. Mascarenas's argument is predicated on the contention that his arrest was not supported by probable cause. During the course of the encounter at the bar, Mascarenas was arrested when he refused to accompany the police officers outside for "fighting in public." The crime of "fighting in public" is defined at Wyo. Stat. Ann. § 6–6–101 (LexisNexis 2003) as:

> A person commits a misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if, by agreement, he fights with one (1) or more persons in public.

Mascarenas points out that there was no evidence that there was any agreement between him and the bartender to fight in public. Accordingly, he contends that there was no probable cause to arrest him and that the actions taken by the police were not in the "lawful performance" of their duties.

**[¶ 9]** The State counters that Mascarenas unreasonably assumes that Officer Davis was referencing § 6–6–101 when the officer announced that Mascarenas was under arrest for "fighting in public." The State argues that aspects of Mascarenas's conduct encompassed in the phrase, "fighting in public," could be construed to justify Mascarenas's arrest "for not only a variety of potential but unknown municipal offenses, but also for a number of statutory crimes." Later, the State suggests that Mascarenas's conduct

2. **§ 6–2–501. Simple assault; battery; penalties.**

   . . . .

  (b) A person is guilty of battery if he unlawfully touches another in a rude, insolent or angry manner or intentionally, knowingly or recklessly causes bodily injury to another.

3. **§ 6–3–201. Property destruction and defacement; grading; penalties; aggregated costs or values.**

supported probable cause for an arrest for: (1) simple battery in violation of Wyo. Stat. Ann. § 6–2–501(b) (LexisNexis 2003) [2] for unlawfully touching another in a rude, insolent or angry manner; (2) property destruction pursuant to Wyo. Stat. Ann. § 6–3–201(a) (LexisNexis 2003) [3] for knowingly defacing, injuring or destroying another's property without his consent; and (3) for breach of the peace in violation of Wyo. Stat. Ann. § 6–6–102(a) (LexisNexis 2003) [4] for disturbing the peace by using threatening, abusive or obscene language or violent actions. In effect, the State argues that the officer's statement that Mascarenas was being arrested for "fighting in public" is more of a description of conduct rather than a reference to a specific offense.

■ **[¶ 10]** Our discussion begins with a review of the standards for determining whether or not a warrantless arrest is justified by probable cause:

> This court also has defined probable cause as " 'the facts and circumstances within the *peace officer's knowledge* and of which he had *reasonably trustworthy information* * * * sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed * * * an offense (emphasis added).' " *Ostrowski v. State,* 665 P.2d 471, 476 (Wyo. 1983); *Neilson [v. State,* 599 P.2d 1326 (Wyo.1979), cert. denied, 444 U.S. 1079, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980) ]. See *Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, reh. denied, 338 U.S. 839, 70 S.Ct. 31, 94 L.Ed. 513 (1949). It is recognized that the standard is an objective one which is not subject to police discretion, *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964), but, even so, the matter of probable

  (a) A person is guilty of property destruction and defacement if he knowingly defaces, injures or destroys property of another without the owner's consent.

4. **§ 6–6–102. Breach of the peace; penalties.**

  (a) A person commits breach of the peace if he disturbs the peace of a community or its inhabitants by unreasonably loud noise or music or by using threatening, abusive or obscene language or violent actions with knowledge or probable cause to believe he will disturb the peace.

cause "is to be viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training." *United States v. Davis*, 458 F.2d 819, 821 (D.C.Cir.1972). The experience and expertise possessed by the arresting officer is to be taken into account. *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Johnson v. United States*, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

The facts and circumstances which justify a determination that probable cause was present must amount to more than mere suspicion, but they need not rise to the level of proof of guilt, nor even to the level of prima facie evidence of guilt. *Ostrowski; Raigosa v. State*, 562 P.2d 1009 (Wyo. 1977); *Brinegar*. The determination of whether the standard was met must be made upon an evaluation of the record. *Ostrowski; Neilson*. In applying the standard, we evaluate the record, with a practical view using good sense. *Vrooman v. State*, 642 P.2d 782 (Wyo.1982).

*Jandro v. State*, 781 P.2d 512, 518 (Wyo. 1989).

[¶ 11] We agree with the State's analysis and conclude that probable cause existed justifying the warrantless arrest of Mascarenas. At the time of the arrest, Officer Davis was in possession of the following information: An anonymous phone call had reported a fight between the bartender and Mascarenas, who was specifically identified by name; upon arrival, Mascarenas was observed standing by the bar engaged in what appeared to be a heated verbal exchange with the bartender, and there was a broken neon sign and glass on the floor. When the officers indicated to Mascarenas that they wished to speak with him outside, Mascarenas refused to comply and physically resisted any effort to remove him from the premises. As noted above, we review a warrantless arrest based upon the entire circumstances "viewed from the vantage point of a prudent, reasonable cautious police officer on the scene at the time of the arrest guided by his experience and training" with our evaluation being guided by "a practical view using good sense." It is obvious from the facts that we have set out from the record that the offi-

cer's reference to "fighting in public" could not have been referring to the statutory offense prohibiting agreements to fight in public. The only rational explanation for the officer's statement is that suggested by the State: The officer was describing conduct rather than the specific offense.

[¶ 12] Based upon our review of the record, there was, at a minimum, probable cause to arrest Mascarenas for breach of the peace. Probable cause could be found here for an arrest based upon: (1) the phone call alleging that Mascarenas was engaged in a physical altercation with the bartender, which was corroborated by the officers' observations of the broken sign and the heated verbal confrontation between Mascarenas and the bartender; and (2) Mascarenas's violent reaction to the officers' request that he exit the bar to discuss the situation with them. A breach of the peace is committed if a person uses "threatening, abusive or obscene language or violent actions with knowledge or probable cause to believe he will disturb the peace." The facts and circumstances noted above justify a determination that probable cause was present. Therefore, the officer was acting in the lawful performance of his duties when Mascarenas assaulted him.

[¶ 13] In his second claim relating to the sufficiency of the evidence, Mascarenas contends that the evidence is insufficient to support a conclusion that Officer Grauberger suffered serious bodily injury. As part of the charge against him, Mascarenas was alleged to have intentionally and knowingly caused bodily injury to Officer Grauberger. The phrase, "bodily injury," is statutorily defined as, "physical pain, illness or any impairment of physical condition." Wyo. Stat. Ann. § 6–1–104(a)(i) (LexisNexis 2003). At trial, Officer Grauberger described the injury from Mascarenas's kneeing as "severe discomfort." Mascarenas contends that during his testimony, Officer Grauberger was equivocal on whether or not the kneeing caused him "pain" or simply "discomfort." Mascarenas insists "discomfort" is not the same as "pain." In fact, Mascarenas points out that Officer Grauberger went on with his duties that night and did not need medical treat-

ment. Accordingly, Mascarenas concludes that the State had failed to present sufficient evidence to support a conclusion that he caused bodily injury to Officer Grauberger.

[¶ 14] Officer Grauberger testified during trial about the assault and its effects:

Q: Okay. And so during the pat down search, what happened?

A: There were several items in his pockets. There was [*sic*] no tables in the immediate area or chairs or anything, so as I took items out of his pockets to ensure there weren't weapons involved or anything, I just placed them on the floor to my right. One of the things was a pack of cigarettes. I set the cigarettes down on the floor, and [Mascarenas] moved his left foot over and stepped on the cigarettes. And I looked down at the cigarettes, and [Mascarenas] said there's—and I don't remember the exact quote. But he said, there's my cigarettes and then he kneed me in the testicles.

Q: Did you suffer any physical pain as a result of being kneed in the testicles?

A: It hurt.

Q: Was it severe or moderate?

A: It was pretty good. I didn't double over or anything like that, but—

Q: Okay. And how long do you think you suffered physical pain?

A: Roughly three days. It was discomforting.

[Tr. at 112–13]

. . . .

Q: All right. Did you ever receive any treatment for the injury to your testicles?

A: No. I just spoke to the on-shift emergency room physician.

Q: And what did you speak to the physician about?

A: I told him what had happened. He asked me if there was any swelling or blood in my urine or anything like that. I told him, no, not that I had noticed. He told me to watch for those symptoms and should they occur to come in immediately and be seen.

Q: Okay. And were you able to finish out your shift that night, as far as finish working?

A: I believe I did, yes.

Q: Okay. And you testified that you had pain for approximately three days?

A: Approximately.

Q: Okay. And were you able to work and have activities during those three days?

A: I don't recall that I had to work. I think that was my last night shift, so I think I was on days off following that.

Q: Okay. Did you have to ice your groin area or provide any treatment to the groin area?

A: There was ice, yes.

Q: Okay. Did you ice it that night?

A: After I got home.

Q: Okay. And any of the following days?

A: Just once the next day, I believe.

On cross-examination, Officer Grauberger was questioned further about the injury:

Q: And he actually kneed you right in the groin?

A: It was not a direct hit, no.

Q: It wasn't a direct hit?

A: No. Well, I didn't have a direct hit when I got kneed, but it dropped me right down to the ground. I was down there for 10 minutes or so waiting for the pain to subside.

Q: But you kept on your job, correct?

A: Correct.

Q: So it wasn't that painful at all, was it?

A: Yes, it was.

Q: Well, why didn't you put in the record—You put that you experienced discomfort.

A: Severe discomfort.

Q: Severe discomfort. This is severe discomfort? Pain is pain. Isn't pain simply pain?

A: To some people, I suppose.

Q: But pain to you is discomfort?

A: That was.

Q: It was discomfort?

A: Yes.

. . . .

Q: Now, you called this doctor on duty at the emergency room. Was that after your shift ended or before your shift ended?

A: No. It was once I arrived at the police department.

Q: When did you arrive at the police department?

A: After [Mascarenas] was seen by the physician.

Q: After he was seen by the physician. Why didn't you talk to the physician when you were in the emergency room? Weren't you in pain at that time?

A: It was—

Q: Or severe discomfort, as you put it?

A: It was increasing.

Q: It increased. Okay. Did you notify the physician that it was increasing?

A: Not at that point, no. He was busy with [Mascarenas].

Q: No, no. I'm talking about after you got back to the police station, did you ask the physician—or tell the physician that the pain is increasing, it's been increasing all night. Did you?

A: I don't recall.

Q: You don't recall. You finished out your shift, did you not?

A: It was, as I recall, it was almost over when I arrived back at the police department, or it had just ended.

Q: Okay. Did the pain increase after you left the police department?

A: And went home?

Q: Yeah.

A: No. It quit increasing.

Q: Did it decrease at that point?

A: No, it was just a continuing discomfort.

Q: Continuing discomfort. Who told you to put ice on it?

A: The physician.

Q: The physician told you to put ice on it. And you put ice on it the next day?

A: When I arrived home after shift that night, as well as, I believe, one time the next day.

Q: And it didn't concern you that this discomfort continued for two days, and it didn't concern the doctor that this discomfort was continuing?

A: No. He told me what to look for and I, I guess, monitored that. And I never seen any of those symptoms.

Q: Had you ever been kicked in the groin before?

A: Yes.

Q: Did you have the pain or discomfort, as you call it[,] for days afterwards?

A: The one time that sticks out in my mind, yes.

Q: One time. And how were you kicked at that time?

A: During a soccer or football game.

Q: Okay. Full force?

A: I don't believe so, no.

Q: No. Pretty big guy that kicked you?

A: Bigger than me.

Q: Did you see a doctor that time?

A: Yes, I did.

Q: And was it just the routine ice pad on your groin area?

A: Ice and monitor for swelling and blood in the urine.

Q: But you did that, you just had discomfort for three days?

A: Correct.

Q: Okay. But you didn't—When this initially happened, you didn't even double over, I think is your testimony, you didn't even double over, you went on arresting [Mascarenas]; isn't that true?

A: I didn't, other officers took [Mascarenas] to the ground.

Q: But you didn't double over, anything like that, you continued with your duties?

A: Not that I recall, no.

The prosecutor revisited the issue with Officer Grauberger during redirect examination:

Q: Now, have you ever been in pain and not doubled over?

A: Yes.

Q: Okay. So there are, in your experience, various kinds of pain, different kinds of pain, pains in your arm?

A: To me personally, yes, there is.

Q: And with some of those pains, I take it you don't double over?

A: No.

Q: And in this instance, you experienced pain when you were kneed in the groin, correct?

A: Yes. I believe I called it severe discomfort.

Q: Okay. And when you said "severe discomfort," does that to you mean pain?

A: It hurt, yes.

[¶ 15] In light of the statutory definition of "bodily injury," we conclude that there is more than sufficient evidence that Mascarenas caused bodily injury to Officer Grauberger. As noted above, the statute defines "bodily injury" as "physical pain, illness or any impairment of physical condition." § 6-1-104(a)(i). Officer Grauberger testified that immediately after being kneed, he went to the ground for ten minutes while waiting for the pain to subside. Thereafter, he had to apply ice on the affected area the night of the incident and once the next day. Officer Grauberger indicated that he experienced "discomfort" over a three-day period. While Officer Grauberger described his injury as "severe discomfort," several times he specifically equated that with pain. The statute does not specify particular gradations of physical pain, illness, or impairment. The jury heard this testimony and concluded that Mascarenas had inflicted bodily injury on ·Officer Grauberger. The evidence clearly is sufficient to support that determination.

[¶ 16] In his final issue, Mascarenas contends that the State failed to disclose material, exculpatory evidence in violation of *Brady*. During his testimony, Officer Grauberger testified that the hospital had medical records related to his injury. Prior to trial, the district court issued an order requiring the State to disclose all exculpatory evidence. A conference was held at the bench, which was memorialized in the transcript after the jury had been excused for deliberations. The parties disputed what exactly Officer Grauberger had meant when he indicated that the hospital had a "record" related to his injury. The State contended that the "record" was merely a log showing that the officer had indeed called the emergency room. The defense, on the other hand, believed the "record" would indicate the substance of the discussion between the officer and the physician on the nature and extent of the injury. The State replied that it had asked the officer whether records as described by the defense existed and he had replied negatively. The trial court took no action, noting that there was "no specific request of the Court regarding this matter."

[¶ 17] On appeal, Mascarenas contends that the medical records were never disclosed in violation of the district court's pretrial order. He argues that the information in the record was highly relevant to the defense since it went to the sufficiency of the evidence that Officer Grauberger had suffered bodily injury. Mascarenas argues that the failure of the State to disclose or produce this material evidence is grounds for reversal.

[¶ 18] In order for a *Brady* violation to be established, a defendant must show that the prosecution suppressed evidence, that the evidence was favorable to him, and that the evidence was material. *Davis v. State,* 2002 WY 88, ¶ 16, 47 P.3d 981, ¶ 16 (Wyo.2002) (citing *Helm v. State,* 1 P.3d 635, 639 (Wyo.2000)). The defendant has the burden of proving that he was denied constitutionally material evidence and of providing evidence supporting such a claim. *Roderick v. State,* 858 P.2d 538, 544 (Wyo.1993). Mascarenas's argument must fail because there is no indication in the record that the evidence allegedly contained in the medical records was either favorable or material. Mascarenas did not make the medical records part of the case record nor did he move for a new trial before the district court. Without the benefit of a hearing or the presence of the alleged exculpatory evidence in the record, we can only speculate as to what the records contained. In short, Mascarenas has completely failed to carry his burden of demonstrating that he was denied constitutionally material evidence, and his claim must fail.

**CONCLUSION**

[¶ 19] There was sufficient evidence that Officer Grauberger was acting in the lawful performance of his official duties and suffered bodily injury as the result of having been kneed in the groin by Mascarenas. Furthermore, Mascarenas has failed to carry his burden to demonstrate that a *Brady* violation existed when certain medical records

were not disclosed.  Mascarenas's conviction
is affirmed.