2005 WY 121

**Laura Lee PERRITT, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 04–88.**

Supreme Court of Wyoming.

Sept. 23, 2005.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Sen-

ior Assistant Attorney General; and James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before HILL, C.J., and GOLDEN, KITE, VOIGT and BURKE, JJ.

HILL, Chief Justice.

[¶ 1] Appellant, Laura Lee Perritt (Perritt), seeks review of her conviction for obtaining property by false pretenses. She contends that the evidence was insufficient to sustain her conviction, that the district court erred by including an award of restitution to the State as a part of her sentence, that the prosecutor engaged in misconduct throughout her trial, that irrelevant evidence was admitted concerning her husband's bad behavior that prejudiced her right to a fair trial, and that the cumulative effect of trial errors mandate reversal of her conviction. We will reverse the judgment and sentence of the district court on the basis that the evidence was not sufficient to sustain the conviction and remand to the district court with directions that the information be dismissed with prejudice.

[¶ 2] Perritt raises these issues:

I. Was there insufficient evidence that [Perritt] obtained "property" from the State of Wyoming through false pretenses?

II. Did the trial court err in ordering [Perritt] to pay restitution to the State of Wyoming?

III. Did the prosecutor commit misconduct in opening statement and closing argument?

IV. Did the trial court err in admitting irrelevant, prejudicial information concerning [Perritt's] husband?

V. Does cumulative error warrant reversal of [Perritt's] conviction?

The State's recitation of the issues essentially conforms to that of Perritt.

## FACTS

[¶ 3] On August 6, 2000, Perritt submitted an Application for Day Care Certification to the Department of Family Services (DFS). The application form included a requirement that Perritt answer this question: "Have you or anyone in your home/staff been charged with a felony or the subject of a substantiated child abuse/neglect investigation?" Perritt answered the question "No." The record is clear, and Perritt makes no contention to the contrary, that she knew that her husband, Kris Perritt (Kris or Husband), had been convicted of sexual assault in the second degree on June 11, 1996. However, she characterizes her answer as truthful, or at least not false, on the basis that she did not consider Kris to be "in her home" or "on her staff" because, although married to him, they were separated and he did not live in their home on a regular basis. She also contended that he was to have nothing to do with the day care business, and was to have no unsupervised contact with the children [1] served by her business. There was some evidence presented that Perritt admitted to DFS investigators that she did not disclose to DFS that her husband resided with her because she assumed that certification of her business would not be forthcoming if DFS knew of the marriage and the extent to which the Perritts still "lived" together. Perritt denied that she made such a statement.[2]

---

1. Indeed, a condition of Husband's probation was that he was not to have unsupervised contact with children, except his own child and his stepchildren. That condition of his probation was in effect during almost all of the time period that was the subject of the criminal charges against Perritt. The only evidence at trial on this subject was that Kris had successfully completed his probation, and that he would not have been discharged from probation, and his probation likely would have been revoked had he violated that condition.

2. An interesting sidelight of this case is that Perritt was not permitted to have her mother accompany her when she was interrogated by

investigators from the DFS Prosecution, Recovery, Investigation, Collection and Enforcement (PRICE) unit. At trial, Perritt challenged the voluntariness of many of her statements, as well as the accuracy of the investigators' written summary of the tape recorded interrogation session that lasted almost two and one-half hours. A DFS investigator testified that it was their policy to have two investigators present during such interrogations, one to be the questioner and one to be a "witness." However, the subject of the interrogation was not permitted to have a "witness" present. Eventually, DFS lost the tape recording of the session, so Perritt was placed

[¶ 4]   On August 18, 2000, in response to her application, Perritt received Certificate No. 6975 authorizing her to operate a family day care home.   On August 21, 2000, Perritt submitted a Provider Registration Form (DFS 203).   Completion of that form allowed Perritt to receive payments for child care services from DFS on behalf of eligible clients.   One provision of that form was this:

2.   The **provider must furnish the name and Social Security Number of all adult household members and any substitute provider(s) who have access to the children placed in care.**   Each adult listed below must provide a signed and dated Authorization Release of Child or Disabled Adult Central Registry and Wyoming Criminal History Record Information (SS–26).   A favorable Child Abuse–Neglect Record Check and a Criminal History Prescreening Report must be received for these individuals as well as the provider. [Emphasis added.]

Perritt listed only herself on this form for the same reasons that she did not include her husband on her initial application.

[¶ 5]   At the bottom of that form, Perritt was required to sign this "Certification:"

I certify I have read and agree to the conditions listed above.   I certify all answers and statements made by me on this form are true and correct.   I understand providing false information can result in loss of registration status as a child care provider.   I understand the loss in registration status will result in my business no longer being eligible to receive DFS subsidized child care payments and could result in prosecution allowable under the law.

By signing that form, Perritt also acknowledged that she understood that DFS would not pay her if she committed fraud against DFS.

[¶ 6]   On April 17, 2001, Perritt submitted an Application for Day Care Certification so as to expand her business from a "Family Day Care Home (2–6 Children)," to a "Group Day Care Home (7–11 Children)."   In that form, she also answered the question posed in her initial application in the negative, i.e.,

that no one in her home/staff had been charged with a felony or had been the subject of a substantiated child abuse/neglect investigation.   On April 17, 2001, Perritt received Certificate No. 6975, authorizing her to operate a group day care home.

[¶ 7]   DFS rules governing "Child Care Provider Eligibility and Payment Requirements" were an important part of the evidence against Perritt.   Indeed, those rules were given to the jury in the form of Instruction No. 13:

**Section 14.   Child Care Provider Eligibility and Payment Requirements.**

(a) The selected child care provider must:

(i) Be someone other than a mother, father, stepparent, member of the assistance unit, or foster parent who keeps or cares for a minor at the request of the parent(s)/caretaker(s) or an agency that is legally responsible for the child and receives payment for that care.

(ii) Be at least (eighteen) 18 years old or be emancipated in accordance with W.S. 14–1–101.

(iii) Be licensed by the State of Wyoming unless the provider is legally exempt from licensing under W.S. 14–4–102.

(iv) Provide care within the State of Wyoming.

(v) Complete the provider registration process.

(vi) Meet all state, local and federal laws related to operating a child care business.

(vii) Meet the minimum health and safety standards including:

(A) An operable smoke alarm or detector must be installed on all floor levels and an operable telephone must be available where the child care takes place.   Exception: A telephone is not required when the care is provided in the child's own home.   However, there needs to be a phone nearby that can be used in case of an emergency and the case file must be documented when this exception applies.

into the position of being in a credibility contest with the DFS investigators.

(B) The provider must keep immunization records of the children.

(viii) Receive a favorable Child Abuse–Neglect Record Check and a Criminal History Prescreening Report or good cause has been shown.

(A) **The provider must furnish the name, Social Security number and a signed authorization of release from all adult household members and any substitute provider(s) who have access to the child(ren) placed in care.**

(I) A Child Abuse–Neglect Record Check and a Criminal History Prescreening Report will be done on these individuals.

(II) The provider will be held responsible for the actions of any employee, substitute or household member who has contact with the child(ren) while the child is in care.

(1.) **Refusal of the provider to furnish the name(s) and Social security Number(s); or**

(2.) **The presence of any person(s) in the child care facility against whom there has been substantiated child abuse/neglect may make the provider ineligible to receive payment from DFS for child care services. (W.S.14–3–213)**

(ix) Allow parental access any time during business hours. (45 CFR 98.31)

(x) Make the Provider Registration Form available for public viewing upon request.

(xi) The substitute provider must meet the minimum health and safety standards and complete the provider registration process if the care goes beyond twenty-four (24) hours during a month because the provider is no longer considered a substitute.

(xii) Child care providers must meet the requirements of the Americans with Disabilities Act.

(xiii) The provider must maintain accounting records and other evidence services were provided in accordance with each authorization and make these records available to state and federal auditors upon request.

(b) Payment for provider services is allowed only to providers who meet the criteria listed in (a) above as verified by the parent/caretaker.

(c) **Payment for provider services is not allowed:**

(i) **For the period of time the provider is in violation of any federal, state, or local law, rules and/or regulations applicable to a child care business.**

(ii) **Payment is not allowed when abuse or neglect has been substantiated, unless a good cause determination has been made in accordance with W.S. 14–3–213(c).**

(iii) Payment is not allowed to a provider when one of the natural, adoptive parents or stepparents is in the home and available to care for the child(ren). Payment to a provider is allowable if the child(ren) will be at risk of neglect or abuse as verified by Child Protective Services (CPS) if the stepparent or the grandparent in a minor parent situation provides the care.

(iv) An E & T participant is not entitled to the dependent care reimbursement if a member of the E & T participant's Food Stamp assistance unit provides the dependent care services. (7 CFR 273.7)

(d) The child care provider is not considered a State of Wyoming DFS employee.

(e) The child care provider is required to complete the prescribed DFS form for child care expenses and return it to the DFS field office within ninety (90) days of when the month of service was provided for DFS to make any payment. Failure to submit the bill within the ninety (90) days will mean the provider's payment is forfeited unless the delay was the result of agency error.

(i) The DFS payment amount will cover and not exceed the actual eligible authorized hours used at the lowest rate of actual charge, local market rate, or statewide limit.

(ii) Payment is not allowed to more than three providers per child within a six month period unless good cause has been established.

(f) The State of Wyoming and DFS have no responsibility for unpaid bills for child care fees charged above state rates or for the parent's/caretaker's obligation for the cost of care.

(g) The provider has the right to establish the child care rates for his/her facility.

(i) The rates charged to those receiving assistance from DFS must be the same rates as those charged to non-DFS clients.

(ii) When the provider has a rate other than hourly, the provider's rate must be converted to an hourly scale. The rate paid on the hourly scale cannot exceed the provider's daily, weekly, or monthly maximum rate.

(iii) Providers/Directors must submit any change of their rates to DFS using a prescribed DFS form and a copy of the rate sheet they use for non-DFS clients.

(iv) DFS will use the new rate when the provider submits the new rate more than five (5) working days prior to the effective date of the change. When the new rate is submitted less than five working days prior to the change, the new rate will be effective five (5) working days after it is received. The new rate applies only to authorizations written after the rate change.

(h) Payments may continue when a provider requests an administrative hearing pending action taken by the Child Care Licensing Unit unless there is a substantiated child abuse or neglect case.

(i) Overpayment, fraud and intentional program violation disqualification pro-

cedures in section 13 apply. [Emphasis added.][3]

[¶ 8] Because DFS believed it had proof that Kris was present in Perritt's home during parts of the time the day care business was in operation, on September 20, 2001, DFS issued an Order of Summary Suspension prohibiting Perritt from continuing to operate her day care business. However, DFS personnel continued to investigate this matter and its potential as a criminal matter to be presented to the Natrona County District Attorney for prosecution. Upon completion of the investigation, the results of that investigation, including an alleged admission by Perritt that she had deliberately concealed Kris's presence in her home from DFS, was promptly referred to the Natrona County District Attorney for criminal prosecution. We will discuss other essential facts in the context of each issue presented.

## DISCUSSION

### *Sufficiency of Evidence of False Pretenses*

[¶ 9] In addressing a claim of insufficiency of the evidence, we must determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. When considering a claim of the sufficiency of the evidence, we review that evidence with the assumption that the evidence of the prevailing party is true, disregard the evidence favoring the unsuccessful party, and give the prevailing party the benefit of every favorable inference that we may reasonably draw from the evidence. We will not reweigh the evidence nor will we re-examine the credibility of the witnesses. *Pacheco v. State*, 2004 WY 160, ¶ 6, 102 P.3d 887, 889 (Wyo.2004); *Mascarenas v. State*, 2003 WY 124, ¶ 3, 76 P.3d 1258, 1260 (Wyo.2003)).

[¶ 10] The elements of the crime of obtaining property by false pretenses are readily gleaned from Wyo. Stat. Ann. § 6–3–407 (LexisNexis 2003), which provides:[4]

3. We have presented this instruction in an edited format. As presented to the jury, this instruction was almost indecipherable. Only the portions of the instruction that we have highlighted above (they were not highlighted in the actual instruction) were pertinent to this case, and we are hard pressed to understand why the instruction was not edited for content, as well as for deciphera-

bility, particularly in light of the prosecution's argument to the jury that it should ignore most of the instruction.

4. This statute was amended in 2004, increasing the breaking point between the felony level and the misdemeanor level to $1,000.00. Wyo. Stat. Ann. § 6–3–407 (LexisNexis 2005).

## § 6-3-407. Obtaining property by false pretenses; penalties.

(a) A person who knowingly obtains property from another person by false pretenses with intent to defraud the person is guilty of:

(i) A felony punishable by imprisonment for not more than ten (10) years, a fine of not more than ten thousand dollars ($10,000.00), or both, if the value of the property is five hundred dollars ($500.00) or more; or

(ii) Repealed by Laws 1984, ch. 44, § 3.

(iii) A misdemeanor punishable by imprisonment for not more than six (6) months, a fine of not more than seven hundred fifty dollars ($750.00), or both, if the value of the property is less than five hundred dollars ($500.00).

[¶ 11] The sense of that statute is supplemented by some statutory definitions. For instance, " '[p]erson' includes an individual, partnership, corporation, joint stock company or any other association or entity, public or private." Wyo. Stat. Ann. § 6-1-104(a)(vii) (LexisNexis 2005). "Property" is defined as: "anything of value whether tangible or intangible, real or personal, public or private." Wyo. Stat. Ann. § 6-1-104(a)(viii) (LexisNexis 2005).

[¶ 12] The State's theory of the case was that Perritt's false pretense was her failure to disclose that her husband Kris was living in her home during the period September 26, 2000, through December 31, 2001. Furthermore, the State argued that she concealed that fact so that she could collect money from DFS on behalf of parents who were eligible for day care services. The State also asserted that Perritt received eighteen checks from the State in the total amount of $25,938.21.[5] It is not contended that Perritt did not actually perform the services for which she was paid, rather it is contended that she was not entitled to those payments because of her false representations to DFS about her husband. The jury was given these instructions in that regard:

### Instruction No. 7

The elements of the crime of Obtaining Property by False Pretenses, as charged in this case, are:

1. On or about September 26, 2000 through and including on or about December 21, 2001;

2. In Natrona County, Wyoming;

3. The Defendant, Laura Lee Perritt;

4. With the intent to defraud another person, to-wit: the State of Wyoming;

5. Knowingly obtained property from that person, to-wit: the State of Wyoming;

6. By false pretenses; and

7. That the value of property obtained was $500.00 or more.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the Defendant guilty. If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the Defendant not guilty.

[¶ 13] The jury was also given the statutory definitions of "person" and "property." The jury was informed that DFS is an agency of the State of Wyoming. This instruction was also given: "YOU ARE INSTRUCTED that a license is not property as between the licensing authority and the license holder. A license is merely a privilege to be granted or denied." We note for the purpose of clarity that, although the statute speaks of a certification process and the piece of paper issued is denominated a "certificate," DFS referred to this process as licensing in its rules and regulations and in its organizational structure, and routinely referred to the "certificate" as a "license." This lack of discipline in

---

5. In this regard *see* Wyo. Stat. Ann. § 6-3-410 (LexisNexis 2005):

§ 6-3-410. **Value of property may be aggregated in certain cases.**

The amount of property involved in violations of W.S. 6-3-402 through 6-3-404 and 6-3-406 through 6-3-408 committed pursuant to a common scheme or the same transaction, whether the property is taken from the same person or different persons, may be aggregated in determining the value of the property.

the use of terminology is of no consequence to the resolution of this case.

[¶ 14]   The jury was also instructed:

### Instruction No. 12

You are instructed that to prove the crime of Obtaining Property by False Pretenses it is sufficient if you are satisfied beyond a reasonable doubt that the pretense proved to be false was a controlling part of the moving causes inducing the owner to part with its property—regardless of the presence of other inducing factors or statements which may have been true.

[¶ 15] The crime of false pretenses has deep roots in Anglo–American law. That crime is defined in slightly different ways in the various jurisdictions but as a general rule has five elements: (1) a false representation of a material present or past fact (2) which causes the victim (3) to pass title to (4) his property to the wrongdoer, (5) who (a) knows his representation to be false and (b) intends to defraud the victim.   3 Wayne R. LaFave, *Substantive Criminal Law* § 19.7 at 114–115 (2nd ed.2003).

[¶ 16]   We have articulated our views on the elements of this crime in various ways over the years.   For instance, in *Martins v. State*, 17 Wyo. 319, 98 P. 709, 712–13 (1908) we said:

There can be no question upon the face of this statute that the property so obtained, in order to constitute the offense, must be obtained from the owner by means of false pretenses.   There can be no party defrauded within the purview of this statute except the owner or one having a special ownership in, and who is induced by false pretenses to part with, his property.   The fraud contemplated is the fraud which is perpetrated against the owner of the property.   In this respect our statute is different from that of some states, where intent alone is sufficient, regardless of whether it be to defraud any specific person (19 Cyc. 415), or when the attempt to obtain goods by false pretenses is made a distinct felony.   Having no statute making it a crime to attempt to obtain goods by false pretenses, decisions under

such a statute are inapplicable to the case before us.   Under the statute the intent to defraud the person from whom the property is obtained by means of *false pretenses* is an essential element of the crime. In the absence of such intent the crime is not complete, and even *if* such intent be present the crime is still not complete unless the party from whom the goods were so obtained was actually defrauded.   19 Cyc. 411, and cases there cited. Naked possession by an agent of his principal's property does not vest title of ownership in such agent.   It is said subdivision "d," at page 408 of 19 Cyc.: "To constitute an obtaining of property, defendant must in the first place acquire at least a voidable title to the property; that is, the owner must intend to invest him with the title, as distinguished from the mere custody or possession of the goods."   This text is fully supported by citations in the footnotes.   Under a similar statute the Supreme Court of Wisconsin said: "The crime is defined in section 4423, St. 1898, and consists in obtaining the money or property of another by false pretenses.   It must be obtained from the owner by false pretenses." *Owens v. State*, 83 Wis. 496, 53 N.W. 736; section 472, 2 Bishop's New Criminal Law. The crime is statutory, and the information should set forth all the requisites of the statute to constitute it. The ownership should by the averments of the information be correctly stated.   Bishop's New Criminal Proc. § 173; Wharton's Criminal Law (8th Ed.) §§ 1211, 1223, 932, 977;   Wharton's Criminal Ev. § 94;   19 Cyc. 425, 426, 434, and cases cited; *Leobold v. State*, 33 Ind. 484; *Halley v. State*, 43 Ind. 509; *State v. Miller*, 153 Ind. 229, 54 N.E. 808; *State v. Lathrop*, 15 Vt. 279; *Washington v. State*, 41 Tex. 583.

In the case before us the information charges that the money was obtained from Julius Mayer, and while the ownership is not laid in any one else-nor is it directly laid in Mayer for that matter-yet the inference is that it was his money.   Without discussing the sufficiency of the information in this respect, as that question has not been here presented, but conceding for

the purpose of this case alone that it is sufficient, we pass to a consideration of the evidence to see if it be sufficient to support a verdict, and whether or not the verdict is contrary to the evidence.

From the evidence it appears that the money obtained from Mayer was not his money, but was the money of one Robert Freedman, by whom Mayer was employed, and that Mayer had authority to receive and cash checks as agent for his employer. It is not alleged in the information how or in what capacity Mayer held the money, or the relation if any he sustained to Freedman, nor is it alleged that the money so obtained was Freedman's money. *Owens v. State, supra; Jacobs v. State,* 31 Neb. 33, 47 N.W. 422; *People v. Krummer,* 4 Parker, Cr. R. (N.Y.) 217. The defendant was not charged with obtaining Freedman's money by false pretenses, but with obtaining money from Mayer by false pretenses. In view of the uniform holdings, under a statute similar to ours, that ownership is a material averment and must be proved as laid, it is difficult to understand how A. can be convicted upon an information which charges the obtaining of money under false pretenses from B. upon proof of ownership of the money in C. The issue tendered, if any, was that Mayer was the owner of the money. The proof was that Freedman was the owner. It is not alleged in the information that Mayer was the agent of Freedman, and that pursuant to authority of his principal he acted upon the false representations, and for that reason his agency or right to pay out money other than his own was not in issue. Proof of ownership in Freedman of the money obtained which was offered and submitted by the state was inconsistent upon the face of the information with ownership in Mayer as therein alleged, and, in the absence of allegations showing ownership in Freedman and the agency and authority of Mayer to cash the check with Freedman's money, must be considered and treated as proof of a separate and distinct crime. Such evidence disproved defendant's guilt of the crime as charged. No false pretenses other than those to Mayer are alleged or proven. He was not defrauded,

for the money obtained did not belong to him, and upon the evidence in this case, if any one was defrauded, it was Cordove or Romero, and no false representations were made to either of them. The crime, if any was proven, was not the crime charged. It is not necessary to discuss the question as to whether proof alone of possession by Mayer of the money which defendant obtained would be prima facie sufficient to support the verdict if ownership were directly laid in Mayer. Upon the evidence the latter had nothing more than the mere naked possession (*Owens v. State, supra*), and it is sufficient to say that the proof is not limited to his possession alone, but upon the record it is undisputed that Freedman was the owner for whom Mayer was acting. There was more than a variance in the proof; there was a failure to prove the crime, if any, as charged, although proof was submitted tending to prove a separate and distinct crime and with the commission of which the defendant was not charged. The verdict is contrary to the evidence.

The judgment will be reversed, and the cause remanded for a new trial, or such further proceedings as may be deemed proper not inconsistent with this opinion.

[¶ 17] In *Lopez v. State,* 788 P.2d 1150, 1152 (Wyo.1990), we held:

> In order to demonstrate a violation of § 6-3-407(a), the State had to establish the following elements beyond a reasonable doubt:
>
> (1) the pretenses;
>
> (2) their falsity;
>
> (3) the fact of obtaining property by reason of the pretenses;
>
> (4) the knowledge of the accused of their falsity; and
>
> (5) the intent to defraud.

*Miller v. State,* 732 P.2d 1054 (Wyo.1987); *Driver v. State,* 589 P.2d 391 (Wyo.1979).

[¶ 18] In *Craver v. State,* 942 P.2d 1110, 1113–14 (Wyo.1997) we held:

> In Wyoming, convictions for the crime of obtaining property by false pretenses have been limited to misrepresentations of an existing or past fact. In *Driver v. State,*

589 P.2d 391 (Wyo.1979), this Court acknowledged that it had not yet decided whether a false promise of future action, which at the time of its making the promisor does not intend to perform, will constitute a false pretense under the Wyoming statute. *Id.* at 393. It remains an open question. At one time, most courts limited the crime of obtaining property by false pretenses to those cases of a misrepresentation of existing fact, but an increasing number of states are applying it to future acts. The reasoning for the change has been explained as follows:

> While a large number of jurisdictions, sometimes invoking the danger of persons who are guilty of no more than a breach of contract being held criminally liable, have continued to adhere to the traditional rule that the crime of obtaining money or property by false pretenses can only be predicated upon a misrepresentation of a past or existing fact and not upon an intention not to comply with a promise or a statement as to a future act, an increasing number of jurisdictions, usually stressing the opportunities for fraud with impunity under the traditional rule, have held that a present intent not to comply with a promise or a statement as to a future act can be the basis of the crime of obtaining money or property by false pretenses.

Michael A. DiSabatino, Annotation, *Modern Status of Rule That Crime of False Pretenses Cannot Be Predicated Upon Present Intention Not To Comply With Promise Or Statement As To Future Act,* 19 A.L.R.4th 959, 964, 1983 WL 190686 (1983).

Because early common law did not recognize the crime of obtaining property by false pretenses when the pretenses amounted to "merely a promise of future conduct, and common prudence and caution would have prevented any injury arising from it," it became a generally accepted notion that the failure to pay back money or use it as specified at the time of

borrowing raised the concern that disgruntled creditors will instigate criminal proceedings against those who blamelessly encounter ordinary commercial defaults. *People v. Ashley,* 42 Cal.2d 246, 267 P.2d 271, 280–82 (1954), *cert. denied,* 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707 (1954). It is thought by some that allowing the crime to include cases involving future conduct would create a considerable risk of prosecuting one who is guilty of nothing more than a failure or inability to pay his debts. *Commonwealth v. True,* 16 Mass.App.Ct. 709, 455 N.E.2d 453, 454 (1983); *Ashley,* 267 P.2d at 282.

We, however, agree with the conventional wisdom of *Ashley,* and a growing number of courts that this result is avoided because something more than mere nonperformance is required to prove the defendant's intent not to perform his promise, and proof of nonperformance alone is not sufficient in criminal prosecutions based on false promises. *True,* 455 N.E.2d at 454; *State v. Aurgemma,* 116 R.I. 425, 358 A.2d 46, 49–50 (1976); *Ashley,* 267 P.2d at 282. Specific intent is an essential element of the crime of obtaining property by false pretenses in Wyoming. In order to succeed in a prosecution for a promise to perform future acts, the State is required to prove that a defendant had the intent not to perform a promise as well as the falsity of the promises/pretenses, that property was obtained by reason of the pretenses, and the knowledge of the accused of their falsity. *Lopez v. State,* 788 P.2d 1150, 1152 (Wyo.1990); *Miller v. State,* 732 P.2d 1054, 1063–64 (Wyo.1987).

[¶ 19] All of these authorities are instructive, although neither the parties nor the district court made much effort to steer the evidence toward proving, or disproving, the elements of the crime. We have over 1500 pages of transcripts and hundreds of pages of record materials and exhibits. Yet, we are unable to discern in this material the evidentiary facts required to fulfill the basic elemental requirements of the crime of obtaining money by false pretenses.[6] It would not enhance

---

6. However, in this regard *see* Wyo. Stat. Ann. § 6–5–303 (LexisNexis 2005):

**§ 6–5–303. False swearing in nonjudicial or nonadministrative proceeding; false claims or**

our jurisprudence in this regard, or serve the interests of justice, to attempt to force the facts proven at this trial into a mold that clearly will not contain them. When the statute is read in a logical manner, and in light of the more than five centuries worth of incrustations left by the common law, Perritt simply did not run afoul of the law that protects society from those who would obtain money by false pretenses with the intent to defraud.

▇ [¶ 20] Here, Perritt made a statement to the effect that her husband did not live in her home, and/or that he did not have "access to the children" placed in her care. The prosecution's argument to the jury appeared to be that Perritt would be guilty of obtaining the money by false pretenses if the jury found she lied on the initial application for certification, *or* if she lied in her application to become eligible to serve DFS clients, *or* if she lied in each of her applications to DFS for payments. There was no special verdict form, so we are left to guess as to which of these the jury might have agreed upon unanimously. There was some evidence that she made a false statement, and perhaps certainly a less than candid statement, but the proof that it was false cannot be said to be proof beyond a reasonable doubt. The evidence is even more infirm that the information was withheld with the intent to defraud DFS of property.

[¶ 21] Moreover, it is clear that if there were false pretenses at all, it was only in her actual applications for the payments. That application did not require her to identify any household member who may have been convicted of a felony, but rather only those household members "who had access to the children." The State appeared to have proved that Perritt's husband frequented her home. His frequent presence does not conflict with the statements Perritt made, given that he was father to one of Perritt's children and shared custody of that child with her, and was stepfather to her other two children. Perritt presented credible evidence that the two of them were separated, and that they were attempting to work out their marital problems while living apart. The State did not meaningfully contradict that evidence. When viewed in the most favorable light conceivable under these circumstances, the State's evidence placed Husband at Perritt's home on several occasions, but never under circumstances where he had unsupervised access to the children. The State's evidence did not establish beyond a reasonable doubt that Perritt's statements were either false pretenses, as contemplated by the governing statute, or that they were intended to have the effect of defrauding DFS of child care moneys, as the meaning of the phrase "with intent to defraud" is contemplated by the governing statute.[7]

vouchers; penalties.
(a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if, while under a lawfully administered oath or affirmation in a matter where an oath is authorized by law, he knowingly makes a false certificate, affidavit, acknowledgment, declaration or statement other than in a judicial or administrative proceeding.
(b) A person is guilty of a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he knowingly submits a false claim or voucher with intent to defraud.
*Also see* 6 Weil's Code of Wyoming Rules, Department of Family services—Child Care Facility Certification, Child Care Facility Rules, Chapter 4, Section 2(b), 049 185 001–6 through 001–7 (2001) (licensed may be denied, revoked or suspended for furnishing or making any misleading or false statement or report to a licensor).

Also *see* Instruction 13 above wherein it is provided that DFS need not pay claims for services if information provided is incomplete, incorrect, or false.
Finally, *compare and contrast State v. Clark*, 690 N.W.2d 699 (Iowa App.2004), 2004 WL 2002423 (unpublished table decision).

7. Although the context is different, these words from Justice Blume must continue to be a guiding force in criminal justice matters:

[W]e cannot let the conviction of a man, of a crime of which he is not properly proven to be guilty, stand. There must be an orderly, systematic administration of justice, else it will end in chaos, and the guilt or innocence of a man will come to depend upon the caprice of jurors or judges. Despite the momentary temptation to let the man convicted of a crime of which he is not properly proven guilty suffer under that conviction, though wrong, the penalty of that of which he may be guilty, we must set our faces sternly against that temptation, in

[¶ 22] Because we hold that the evidence was not sufficient in this regard, we need not further address other matters raised by Perritt with respect to the sufficiency of the evidence. However, because we reverse, the sentence, and the provisions for restitution, are also reversed. In this regard, we would be remiss if we did not comment that we would have been compelled to reverse the restitution portion of the sentence on the basis that the State did not prove "actual pecuniary damage resulting from the defendant's criminal activity." Wyo. Stat. Ann § 7–9–103(b) (LexisNexis 2005); *Bush v. State*, 2003 WY 156, ¶¶ 11–15, 79 P.3d 1178, 1183–85 (Wyo.2003). Certainly we do not condone in any way Perritt's lack of candor or her attempt to rationalize her subjective interpretation of the forms she completed, in order that she could obtain a certificate to operate a day care and to qualify for DFS day care funding programs. Her conduct most certainly justified the revocation of her license, perhaps she violated some criminal law, and it is possible that she may be subject to some civil suit. Nonetheless, to the extent Perritt obtained property from the State in these circumstances, she "did it the old-fashioned way, she earned it."

[¶ 23] Although this disposes of the appeal we will, nonetheless, make brief comment on other issues Perritt raises in the event there are further proceedings on remand to the district court.

### Prosecutorial Misconduct in Opening and Closing

[¶ 24] Although Perritt correctly identifies significant portions of the prosecutor's argument as misconduct, we decline to discuss these matters in detail because the conclusions we reached above are dispositive of this appeal. However, we would be remiss if we did not note that significant portions of

the prosecutor's argument were improper and may well have constituted reversible error in their own right. The prosecutor exhorted the jury to convict Perritt because her conduct constituted "welfare fraud" when that simply was not the case. The prosecutor pandered to the jury's passions by encouraging the jury to convict Perritt because her husband was a "child molester." He incited the jury to view Perritt as a person who had a "criminal mind" and to convict her on that basis, when there was no foundation in the evidence for such an argument. He vouched for his own expertise and experience in identifying persons who have "criminal minds" and beseeched the jury to convict Perritt on that basis. *See People v. Siefke*, 195 Ill.App.3d 135, 141 Ill.Dec. 833, 551 N.E.2d 1361, 1369–70 (Ill.App. 2 Dist.1990). He counseled the jury to convict Perritt because she had endangered young children, although that was not an element of the offense with which she was charged. Misconduct by the prosecutor of this magnitude often requires reversal of a defendant's conviction because it deprives the defendant of a fair trial. *See Strickland v. State*, 2004 WY 91, ¶¶ 47–52, 94 P.3d 1034, 1053–54 (Wyo. 2004); and *Wilde v. State*, 2003 WY 93 ¶¶ 26–27, 74 P.3d 699, 710–11 (Wyo.2003).

### Error in Admission of Irrelevant and Highly Prejudicial Evidence Concerning Perritt's Husband

[¶ 25] The central feature of Perritt's alleged wrongdoing was her failure to reveal that her husband, a convicted felon, was in her household where she was going to conduct a day care business. As the gravamen of the offense at issue here, the prosecution needed to prove that Perritt's husband had been convicted of a felony and that he was in the home and had access to the children.

order not to subvert our whole structure of civilization. While we continually aim to let the principle of justice prevail in each particular case, yet we cannot lose sight of the fact that justice in the long run is absolutely dependent upon the fact that it must be administered according to the law of the land, and in an orderly, lawful method, and the justice administered in a particular case must be consistent with and meted out in the spirit of that funda-

mental principle which sustains our civilization, not for today or tomorrow, but for the ages to come.
*Wiggin v. State*, 28 Wyo. 480, 206 P. 373, 375 (1922); *also see Misenheimer v. State.* 2001 WY 65, ¶ 22, 27 P.3d 273, 282 (Wyo.2001) (Lehman, J. specially concurring) ("[I]t is not the purpose or end of government to incarcerate as many of its citizens as possible." (quoting *Hubble v. State*, 41 Wyo. 275, 285 P. 153, 155 (1930)).

[¶ 26] Throughout his argument to the jury and in the presentation of the evidence, the prosecutor managed to present to the jury, on dozens of occasions, that not only had Kris Perritt been convicted of a felony, but that he was a convicted "child molester." Although, identifying his crime with specificity may have been proper in that the judgment and sentence was admitted as an exhibit, we conclude that the repetitive use of the phrase "child molester" was improper and likely prejudicial to Perritt's right to a fair trial. We also are comfortable in concluding that the prosecutor's tactics in this regard were deliberate and repetitive, and not fleeting and inadvertent.

[¶ 27] Through the testimony of witness Sherri Rollins, the prosecution sought to prove that Kris Perritt was in the household and that he had access to children. In the course of that testimony, the prosecution also revealed, over the objections of defense counsel, that Kris allegedly had spanked Rollins' child on her bare bottom.[8] We think it obvious that that testimony was irrelevant, more prejudicial than probative, and that it may have deprived Perritt of a fair trial, in and of itself.

[¶ 28] Through the testimony of George Mills, a police officer for the Town of Evansville where the Perritts lived, the prosecution attempted to show that Kris was occasionally at the home where Perritt conducted her day care business. A significant part of his testimony only placed a vehicle owned by Kris at the residence. Much of Mills' testimony tended to place Kris in the light of engaging in unlawful conduct, although the only relevance of his testimony was to place Kris at the day care business during its hours of operation. Mills' testimony should only have been admitted to the extent it actually placed Kris at the residence on several occasions over the course of some 13 or 14 months.

[¶ 29] Through the testimony of witness Tammy Dominguez, the prosecutor managed to portray Kris as an out of control, very angry man, who abused his own children and his dog. Defense counsel objected throughout her testimony, but all objections were overruled. The only relevance of Dominguez's testimony was to place Kris at Perritt's residence, especially at times when the day care was in operation.

## CONCLUSION

[¶ 30] We hold that there was insufficient evidence to sustain Perritt's conviction for the crime of obtaining property by false pretenses. The matter is remanded to the district court with direction that the judgment and sentence be vacated and that the amended information be dismissed with prejudice.

HILL, Chief Justice, delivered the opinion of the Court; VOIGT, Justice, filed a specially concurring opinion.

VOIGT, Justice, specially concurring.

[¶ 31] I concur almost entirely with the rationale and result of the majority opinion. I write separately only because, for several reasons, I am not convinced that these circumstances would always result in insufficient evidence for a conviction. First, the question of whether a license or certificate fits this State's particular statutory definition of "anything of value whether tangible or intangible," has not been adequately briefed or argued in this case, and I believe the matter, therefore, remains open for future decision. Second, inasmuch as the jury was instructed without objection that a license is not property, the law of the case doctrine may dictate a particular result in this case that would not be dictated in another. Third, in addition to the license or certificate, money was also obtained from the State, and it seems to me that with appropriate proof, such could be considered the very conduct forbidden by the statute. And fourth, as the majority points out, the allegations of the Information, coupled with the jury instructions, leave considerable doubt as to what act or acts of the appellant supposedly constituted the crime. In regard to this final point, I would add that this case exemplifies the considerable difficulties created by charging doc-

---

8. We also note in passing, that this evidence was the purest form of hearsay and that its content was never substantiated, even after dogged investigation by DFS.

uments that cover a broad period of time and a broad range of conduct, yet charge only a single crime.